[Civ. No. 2912. Fifth Dist. Nov. 23, 1977.]

DAKOTA GARDENS APARTMENT INVESTORS "B,"
Plaintiff and Respondent, v.
VERNON D. PUDWILL et al., Defendants and Appellants.

348

**COUNSEL**

J. Roderick Jarrett for Defendants and Appellants.

Steven A. Chase, Barrick & Chase and Craig V. Winslow for Plaintiff and Respondent.

**OPINION**

**HOPPER, J.**—In 1972, Gerald R. Rodder and Vernon D. Pudwill (appellants) incorporated Transamerican Builders to invest in real estate development and general contracting. Each man had a one-half interest in the business and each was authorized to pay the company's bills. In February 1972, Dakota Gardens Apartment Investors "B" (Dakota "B")

was formed by George Reed, Jack B. Murray, and others, as a limited partnership to invest in commercial real estate. Neither Rodder nor Pudwill had any interest in the Dakota "B" group; the later transactions between the two groups were strictly arm's length.

In 1972, Dakota "B" agreed to purchase a 154-unit apartment complex in Fresno (the Sutton Place Apartments) from Transamerican Builders. Transamerican was then to lease back the apartments for 60 months in exchange for guaranteeing Dakota "B" a monthly income. Transamerican was to be totally responsible for the operation and maintenance of the apartment complex, including the collection of rent and payment of bills and taxes.

After this transaction was consummated, Pudwill and Rodder formed Vogue Management Company (corporate appellant) to handle the daily operation problems of the Dakota "B" apartments, other commercial property owned by Transamerican, and the individual property interests of Pudwill and Rodder. Pudwill, Rodder and Louis W. Porter were principals in Vogue, and Joseph Casey was its manager. Pudwill had the authority to draw checks against the accounts maintained by Vogue to pay for necessary expenses of the various apartment complexes it managed.

From February 1972 until the spring of 1973, it appeared that the operations were running smoothly; however the principals were often transferring funds from one corporation to another as loans, without adequate documentation. In particular, four loans were made to Transamerican by partnerships or corporations in which Pudwill was participating: Mark I, Inc., Pudwill-Rice, Pudwill-Wells, and the Hope Ranch Motel. These loans were not memorialized by any note or other written evidence of indebtedness, no repayment terms were specified, and no interest charge was imposed. It appears that they were simply transfers of funds from one entity to another to cover current operational deficits. Furthermore, the funds were evidently placed in the control of Vogue Management so that current expenses on the Dakota "B" apartments could be met.

In April 1973 Transamerican was having serious problems meeting its current expenses, which included a sizeable tax obligation owed to the I.R.S. Additionally, the other principals in the creditor-businesses that had loaned money to Transamerican (e.g., Mark I, Inc., Pudwill-Rice, Pudwill-Wells and Hope Ranch Motel) were pressuring Pudwill for

repayment. Finally, Pudwill testified that Rodder was taking substantial amounts of capital earmarked for current expenses from Transamerican and appropriating it for other business and personal uses.

Rodder, Pudwill, and Porter met on April 25 to decide what to do about the four loans, the tax lien, and the demands now being made by the holder of the first deed of trust on the apartment complex. At that meeting, Rodder apparently told Pudwill to do "what he thought was right." However, this version, as related by Pudwill and Porter, is inconsistent with Rodder's story. Rodder testified that on April 24 he removed Pudwill and Porter from the management of Transamerican at a meeting of the board of directors, but Pudwill evidently didn't receive notice of this action until late May. Furthermore, Pudwill's authority to draw checks on the Vogue account was never terminated. There is no indication that Pudwill knew of his removal from Transamerican at the meeting the following day.

On May 4, 1973, Pudwill drew four checks on the Vogue account totaling $10,640.90, payable to the four entities mentioned above. As a result of these payments, Transamerican could not meet its other obligations and became insolvent. Rodder immediately renegotiated the leasing arrangement with Dakota "B."

On May 17, 1973, Transamerican, through Rodder, entered into an agreement with Dakota "B" whereby Dakota "B" would take over the operations of the apartment complex. The liabilities would be distributed as follows: Transamerican would remain liable for all construction costs and Dakota "B" would assume all trade payables, *excluding* "in-house" debts. "In-house" debts were defined as debts incurred when some entity of Transamerican worked on the apartment complex and billed Transamerican for it. The evidence is conflicting as to whether "in-house" debts also referred to the various loans made by entities associated with Pudwill. In addition to distributing the liabilities, the agreement transferred all rental income as of May 1, 1973, to Dakota "B." Finally, a separate assignment was executed by Transamerican (by Rodder) giving Dakota "B" the right to pursue any cause of action Transamerican might have against Pudwill and Vogue as a result of the May 4 payments.

This lawsuit was filed in June 1973 by Dakota "B," the respondent in this appeal, and was based upon a theory of conversion and money had and received. Appellant Pudwill asserted various offsets against respon-

dent and, further, claimed that no conversion had occurred because the payments inured to the benefit of respondent. In addition, Vogue cross-complained for debt. The judge determined Pudwill did not have the authority to repay the loans on May 4. He further found, on the issue of damages, that Transamerican had a valid claim against Vogue Management for $10,842.72, offset by a claim of Vogue against Transamerican for $12,814.60, leaving a net balance owing Vogue of $1,971.88. Finally, the judge determined that Pudwill and Vogue had converted $10,640.90 from Transamerican (the total of the four payments made on May 4) and that the final balance left Pudwill and Vogue owing the assignee of Transamerican (respondent Dakota "B") $8,669.02, plus interest from May 4, 1973. Pudwill and Vogue appeal from that judgment.

Appellants contend that (1) the trial court erred in not offsetting the loan payments made by Pudwill against the conversion damages claimed by respondent and (2) the trial court erred in refusing to make a finding on a material issue of fact. We consider each of those contentions.

■ The trial judge found that the disbursement of Transamerican's funds to satisfy four outstanding loans was a conversion, and we find his decision to be supported by substantial evidence. Appellant Pudwill only had custody of Transamerican funds through Vogue Management Company. Furthermore, the judge could have disbelieved the testimony indicating that Rodder gave Pudwill permission to "do what he thought was right" (e.g., pay the loans off), and could have believed Rodder's testimony that Pudwill was removed from any position of authority on April 24, more than a week before the disbursements were made. Thus, the judge would be justified in believing that Pudwill had no authority to make the disbursements and that he, therefore, converted Transamerican funds.

■ Having determined that a conversion occurred, the judge then determined the damages incurred by respondent and whether or not appellants would be entitled to an offset because of the benefit they conferred upon respondent's assignor. That is, the judge had to decide if the satisfaction of the debts owed to the four creditor-businesses benefited Dakota "B" such that it suffered no damages.

■ Civil Code section 3336 sets out the presumptive measure of damages in conversion,[1] which is rebuttable, save and except when

___

[1]Civil Code section 3336 provides: "The detriment caused by the wrongful conversion of personal property is presumed to be:
"First—The value of the property at the time of the conversion, with the interest from

section 3337 applies.[2] Under Civil Code section 3337, a defendant cannot rebut the presumption by claiming that he applied the converted property to plaintiff's benefit when he took unlawful possession of the property from the beginning. Consequently, the effect of section 3337 is to prevent mitigation when property is stolen from the plaintiff and subsequently applied to his benefit. In this situation, the defendant will not be able to claim that his conversion benefited plaintiff; he will thereby be prevented from claiming an offset derived from his original wrong. In contrast to this situation, if the particular facts of a case indicate, as in the instant case, that the possession was lawful *before* the conversion occurred (e.g., Pudwill had lawful possession of the funds prior to the conversion), Civil Code section 3337 is inapplicable, and a converter is not precluded from claiming mitigation of damages.

Thus, a converter who was, for example, a bailee or agent in lawful possession of the property prior to the conversion may rebut the presumption by proving that he is entitled to mitigation of damages because of the benefit he conferred on the victim. Here appellants were in lawful possession of the money from the beginning, they subsequently converted it, and they now seek an offset based upon mitigation of damages. Section 3337 does not preclude them from asserting a claim for mitigation, but they must show that, under these facts, they are entitled to mitigation as a matter of equity.

■ Mitigation of damages in tort cases is restricted by principles of equity, and in conversion cases, a defendant generally cannot diminish the amount of damages by paying a debt of the injured party without the latter's consent. (Rest., Torts, § 923; *Yeager and Sullivan, Inc.,* v. *Farmer's Bank* (1974) 15 Ind.App. 162 [317 N.E.2d 792, 798]; *Nelson Anderson, Inc.* v. *McManus* (1956) 334 Mass. 394 [135 N.E.2d 302, 306]; *McCarthy* v. *General Electric Co.* (1935) 151 Ore. 519 [49 P.2d 993, 995, 100 A.L.R. 1370]; *Michael-Swanson-Brady Produce Co.* v. *Oregon S.L.R.*

---

that time, or, an amount sufficient to indemnify the party injured for the loss which is the natural, reasonable and proximate result of the wrongful act complained of and which a proper degree of prudence on his part would not have averted; and

"Second—A fair compensation for the time and money properly expended in pursuit of the property."

[2]Civil Code section 3337 provides: "The presumption declared by the last section cannot be repelled, in favor of one whose possession was wrongful from the beginning, by his subsequent application of the property to the benefit of the owner, without his consent."

*Co.* (1925) 219 Mo.App. 419 [271 S.W. 854, 857]; *East* v. *Pace* (1887) 57 Ala. 521; *Northrup* v. *McGill* (1873) 27 Mich. 234; *Lyon* v. *Yates* (N.Y. 1868) 52 Barb. 237; *Edmundson* v. *Nuttall* (1864) 144 Eng.Rep. 113.) To allow mitigation by application of the converted property to the benefit of the injured party would result in the converter dictating to the owner how the owner's property is to be used. Such a result would seriously weaken the concept of property ownership because a defendant would not be penalized for interfering with another person's possessions if the ultimate offset of the interference resulted in a benefit to that person.

The language of the Michigan Supreme Court asserted over 100 years ago is still viable today. That court said in *Northrup* v. *McGill, supra,* 27 Mich. 234, 239-240: "In general, when there is no fraud, and when the law does not forbid, a man may dispose of his own property according to his own ideas of propriety. If he is indebted by note to different parties, he may apply his property to the payment of one, and refuse to apply it to the payment of another, and he may lawfully discriminate in this way, though in doing so he ignores the stronger moral claim resting upon him. This results from the supreme dominion which is involved in the absolute ownership of property."

A contrary view would result in gross abuses and allow officious intermeddlers to determine payment priorities which are best left to debtors.

The exceptions to the rule involve cases where the application of the property is compelled by legal duty, such as liens or security interests (see *Goldberg* v. *List* (1938) 11 Cal.2d 389 [79 P.2d 1087, 116 A.L.R. 900]; *Lee* v. *Merchants Collection Assn.* (1957) 155 Cal.App.2d 762 [318 P.2d 701]; *Driver* v. *Acquisto* (1956) 145 Cal.App.2d 304 [302 P.2d 387]; *Salter* v. *Leventhal* (1958) 337 Mass. 679 [151 N.E.2d 275, 286]), or when the converter causes the plaintiff to owe a debt and then satisfies it himself (Rest., Torts, § 923, com. (a)). Reliance by the appellants on *Strutt* v. *Ontario Sav. & Loan Assn.* (1972) 28 Cal.App.3d 866 [105 Cal.Rptr. 395] is to no avail. The respondent in *Strutt,* unlike the appellants in this case, was not attempting to assert that plaintiff benefited from the conversion, thereby negating any damages he suffered. Rather, the plaintiff, as appellant, was simply arguing that his property was worth more than what he was paid by the converter. The court, however, decided that plaintiff's damages did not exceed the amount he was paid for the converted property and that he therefore did not have a claim for additional damages (28 Cal.App.3d at pp. 874-875).

Here there was neither consent to the application of the benefit nor ratification thereof by the respondent. Nor was there any security interest or compelling legal duty requiring a reduction of damages. Appellant clearly cannot claim equitable mitigation in the present case because (1) he benefited himself and harmed Transamerican by his improper conduct and (2) he officiously paid the debt. Appellant was benefited from the payment from Transamerican's funds because the payment satisfied debts to businesses in which he had an ownership interest. Appellant is not a good faith, but mistaken, converter. Instead he has benefited his own business enterprises at the expense of Transamerican. Furthermore, as a direct result of the payments, Transamerican became insolvent. Since mitigation is grounded on equitable precepts (see 4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 874, at p. 3161), the trial court could prevent mitigation when it would have been inequitable to do otherwise. The trial court had sufficient reasons upon which to deny mitigation. Its discretion should not be disturbed on appeal. Appellants are not entitled to a reduction of the damages.

Appellants' proposed findings of fact differ from the findings adopted by the trial court in that they assert that the disbursements were to pay off legitimate loans. Thus, the proposed findings establish the validity of the loans. The contention of error in refusing to make a finding on a material issue of fact is without merit. As we have held herein, the offset for payments on the loans is not permissible. Consequently, the validity of the loans is immaterial, and the trial court did not err in refusing to adopt the proposed findings.

Judgment is affirmed.

Brown (G. A.), P. J., and Franson, J., concurred.