KINETICS TECHNOLOGY INTERNA-
TIONAL CORPORATION, a Delaware
corporation, Plaintiff-Appellee,

v.

The FOURTH NATIONAL BANK OF
TULSA, a national banking associa-
tion, Defendant-Appellant.

No. 81–1293.

United States Court of Appeals,
Tenth Circuit.

April 14, 1983.

Thomas E. English, Tulsa, Okl. (Charles
P. Gotwals, Jr., Tulsa, Okl., with him on
brief), of Gable, Gotwals, Rubin, Fox, John-
son & Baker, Tulsa, Okl., for defendant-ap-
pellant.

C.S. Lewis, III of Robinson, Boese &
Davidson, Tulsa, Okl., for plaintiff-appellee.

Before BARRETT, LOGAN and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

Kinetics Technology International Corporation (KTI) brought this diversity action seeking damages for an alleged conversion of goods by Fourth National Bank of Tulsa (the Bank). The Bank admits taking possession of the goods from the custody of a third party, Oklahoma Heat Transfer Corporation (OHT), but claims a right to the goods arising under the Oklahoma version of the Uniform Commercial Code (hereinafter UCC or Code), Okla.Stat. tit. 12A, § 1–101 to 11–107 (1981). For the reasons set out below, we affirm in part and reverse in part.

OHT, now defunct, was a manufacturer specializing in constructing heat exchangers to specifications supplied by its customers. On May 25, 1977, the Bank issued OHT a line of credit for $600,000, taking a security interest in OHT's inventory. On June 1, the Bank filed a financing statement covering, inter alia, "[a]ll inventory now or hereafter owned by the Debtor." Rec., vol. I, at 37.

KTI is a company that designs and supplies process furnaces for the refinery and petrochemical industry. On August 18, 1977, it entered into a contract with OHT under which OHT was to build eight furnace economizers to KTI's specifications, in part from materials supplied by KTI, and in part from materials supplied by OHT. KTI was to ship to OHT certain specially designed and manufactured goods consisting of finned tubes, castings, fittings, and anchors (hereinafter referred to as the KTI Goods). OHT was to build eight box units (hereinafter referred to as the Box Units) from materials out of OHT's inventory, and then install the KTI Goods into the Box Units, resulting in eight completed furnace economizers. KTI agreed to make progress payments to OHT at various stages in the process. The purchase order form, supplied by KTI, provided that title to goods delivered to OHT by KTI would remain in KTI. Title to goods acquired by OHT from other sources for use in the KTI contract would pass to KTI upon the first progress (or other) payment made by KTI to OHT. KTI did not file under the UCC.

KTI procured the goods specified in the contract (the KTI Goods), and had them delivered to OHT. Delivery was complete by January 25, 1978. OHT began work on the contract. During this time, OHT's financial situation deteriorated, and it became necessary to seek additional financing from the Bank. The Bank agreed to make additional loans (separate from the line of credit), secured in part by specified accounts receivable of OHT. A loan was made to OHT on January 10, 1978, secured by the progress payments specified in the KTI–OHT contract. The Bank instructed KTI to make the first two progress payments directly to the Bank.

OHT's work on the contract reached the point at which OHT was entitled to the first two progress payments, a total of $42,-600. Both payments, which KTI made on January 10 and January 19, 1978, were received by the Bank. OHT began work on the Box Units, but prior to their completion OHT management determined that the business' financial state could not support continued operation. On January 27, OHT shut down, and on January 30, OHT's management delivered the plant keys to the Bank. At that time, the Bank took possession and control of the plant where OHT's inventory, the Box Units, and the KTI Goods were located.

KTI demanded the surrender of the Box Units and the KTI Goods, but the Bank refused on the strength of its security interest in OHT's inventory, offering instead to sell the Box Units and the KTI Goods to KTI. Consequently, KTI filed this suit for conversion. A prolonged series of negotiations culminated in KTI's purchase of the Box Units and the KTI Goods on March 20, 1978. KTI reserved the right to litigate all issues. After a trial to the bench, the court found that KTI was entitled both to the KTI Goods and to the Box Units, and awarded damages in the amount of $156,-272.30 plus interest. Although we reach a similar result, we do so by a different route.

The Bank's argument for reversal is based on its status as a holder of a perfected security interest in OHT's inventory.[1] The Bank asserts that both the KTI Goods and the Box Units were inventory collateral in OHT's hands, to which the Bank was entitled when OHT defaulted on the line of credit. The Bank contends that KTI's interest in the Box Units and in the KTI Goods amounted only to an unperfected security interest over which the Bank's perfected security interest had priority. KTI argues that the Bank's security interest was ineffective as to the goods at issue because, under the contract, KTI retained title and ownership rights in the KTI Goods and acquired title and ownership rights in the Box Units when it made the progress payments. The Bank asserts alternatively that even if the trial court was correct on the issue of liability, it erroneously computed the amount of damages.

### I.

### BANK SECURITY INTEREST IN THE KTI GOODS

The Bank's claim to the KTI Goods is based on its perfected security interest in OHT's inventory. The Bank argues that when KTI had the KTI Goods delivered to OHT and OHT began work on the contract, the goods became inventory for the purposes of the Bank's security interest. The Bank insists that KTI's rights in the KTI Goods at most amounted to a retained, unperfected security interest. KTI bases its claim on its ownership of the goods as evidenced by the title retention clause in the contract, arguing that OHT was in the position of a bailee. Thus, KTI asserts, the goods were never part of OHT's inventory,[2] and therefore never became subject to the Bank's security interest.

The trial court examined the transaction between KTI and OHT to determine wheth-

er a "sale" by KTI to OHT had occurred when the KTI Goods were delivered to OHT. Finding none, it concluded that " 'Article Two has no application, and § 2–401(1) cannot operate to convert KTI's retention of title into a security interest under Article Nine.' " Rec., vol. I, at 252. The court held additionally that, as a matter of law, " 'OHT has never had any interest in KTI's Goods other than that of a bailee.' " Id. at 253. The court concluded that KTI was entitled to possession of the KTI Goods notwithstanding the Bank's security interest.

In order for the Bank's security interest to include the KTI Goods and be enforceable, it must have attached to the goods. Tit. 12A, § 9–203(1). A security interest attaches to collateral when (1) the debtor (here OHT) has signed a security agreement describing the collateral, (2) value has been given, and (3) the debtor has "rights in the collateral." Id. The first two requirements are met in this case. The issue here is whether OHT had sufficient rights in the collateral to meet the third requirement. The parties' disagreement is centered on whether OHT was a mere bailee of the KTI Goods, or instead had a greater property interest in them.

The phrase "rights in the collateral" is not defined in the UCC. The Code clearly does not require that a debtor have full ownership rights. See, e.g., tit. 12A, § 9–112. The Seventh Circuit has said that the requirement of "rights in the collateral" illustrates the general principal that " 'one cannot encumber another man's property in the absence of consent, estoppel, or some other special rule.' " In re Pubs, Inc., 618 F.2d 432, 436 (7th Cir.1980) (quoting First National Bank & Trust Co. v. McElmurray, 120 Ga.App. 134, 138, 169 S.E.2d 720, 724 (1969)).

---

**1.** KTI does not challenge the perfection of the Bank's security interest.

**2.** The record shows that OHT believed these goods belonged to KTI and were not part of OHT's inventory. OHT had in fact reported to the Bank that there were goods in its plant that

belonged to KTI. Additionally, no loans on the line of credit were made by the Bank after OHT received the KTI Goods. There is thus no question of a loan having been made in reliance on the KTI Goods as collateral.

In *Amfac Mortgage Corp. v. Arizona Mall,* 127 Ariz. 70, 618 P.2d 240 (Ct.App. 1980), the debtor Mall had contracted with a third party for the construction of a shopping mall. The contract specified that the contractor would obtain the needed materials, and that title to the materials would pass to the Mall upon satisfaction of various conditions, including payment. Amfac loaned money to the Mall, taking a security interest in all materials to be incorporated in the Mall. The contractor acquired the materials and had them delivered, but prior to their incorporation and before any payments were made by the Mall to the contractor, the enterprise folded. Amfac brought an action to recover the unincorporated steel. The court, in deciding whether the Mall had had sufficient rights in the steel for Amfac's security interest to attach, stated that a debtor acquires sufficient rights when the debtor obtains possession of collateral pursuant to an agreement with the seller or manufacturer. Possession with contingent rights of ownership was held to be sufficient with or without payment on the contract. *See Evans Products Co. v. Jorgensen,* 245 Or. 362, 421 P.2d 978, 981 (1966) (en banc).

In *Manger v. Davis,* 619 P.2d 687 (Utah 1980), a consignment case, the Utah Supreme Court found that a debtor's "rights" in collateral must be in the nature of authority to subject the property to a security interest, and looked to the law of agency to resolve the issue. *Id.* at 690. In *Connecticut Bank & Trust Co. v. Schindelman (In re Bosson),* 432 F.Supp. 1013 (D.Conn.1977), the court found that under prevailing case law a debtor had sufficient rights when the debtor acquired possession of collateral pursuant to a sales contract or like agreement. The court looked to principles of law external to the Code to find if such "rights" existed. *Id.* at 1018.

Thus, it is clear that for a security interest to attach, a debtor must have some degree of control or authority over collateral placed in the debtor's possession. The Oklahoma Supreme Court, in a case factually similar to the case before us, has said

that the requisite authority exists "where a debtor gains possession of collateral pursuant to an agreement endowing him with any interest other than naked possession." *Morton Booth Co. v. Tiara Furniture, Inc.,* 564 P.2d 210, 214 (Okl.1977). *But see Chrysler Corp. v. Adamatic, Inc.,* 59 Wis.2d 219, 208 N.W.2d 97, 104 (1973) (bailee's possessory interest for limited purpose of repair not sufficient "rights in the collateral"). The *Morton Booth* definition strongly supports the Article Nine purpose of promoting certainty in commercial loan transactions. *See* UCC, § 9–101, Official Comment. Otherwise, if a debtor received collateral from a third party under an agreement giving the debtor authority to exercise any outward indicia or manifestations of ownership or control, a would-be creditor could easily be misled into making a loan under an ineffective security agreement. For example, in *Morton Booth,* the debtor, Tiara, contracted to build gun cabinets from materials supplied primarily by Morton Booth, and then sell the completed products to Morton Booth. Tiara, a furniture manufacturer, subsequently sought and received financing from the Small Business Association, giving the participating banks a security interest in Tiara's present and after-acquired inventory, which apparently consisted of the same types of materials that were supplied it by Morton Booth. *See* 564 P.2d at 211. Had the court found that Tiara lacked sufficient "rights" in the Morton Booth-supplied collateral for the banks' security interest to attach, the banks' claim to the goods upon Tiara's default would have been defeated by the sort of hidden-title subterfuge the Code was intended to prevent.

This reason for the *Morton Booth* result is supported by another feature of Article Nine. In this context, buyers such as Morton Booth and KTI finance a debtor's operation by supplying materials rather than money with which to buy materials. Such a buyer-lender could easily protect itself from after-acquired property creditors of its contractor by filing an Article Nine purchase money security interest in the goods supplied by it to the contractor, as well as those

purchased or otherwise identified in the contract by the contractor. *See* tit. 12A, §§ 9–107, –312(3).[3] Requiring buyers such as KTI to take this additional step—done easily and at minimal cost—thoroughly advances the Code policy of providing notice and certainty to inventory lenders.[4]

■ In accordance with *Morton Booth Co.,* we conclude contrary to the district court that the Bank's perfected security interest in OHT's collateral attached to the KTI Goods.

## II.

### SALE OF GOODS BY OHT

Notwithstanding our conclusion that the Bank held a valid, enforceable security interest both in the KTI Goods and in the materials supplied under the contract by OHT, KTI may still recover if it bought the goods from OHT as sanctioned by the Code before the plant was closed. Under the UCC, a security interest generally "continues in collateral, notwithstanding sale, exchange, or other disposition," tit. 12A, § 9–306(2), and "is effective . . . against purchasers of the collateral," *id.* § 9–201. However, there are several exceptions to this general rule, two of which are pertinent to the case at bar. First, a buyer of collateral will take free of a security interest where the sale by debtor "was authorized by the secured party in the security agreement or otherwise." *Id.* § 9–306(2). Second, "[a] buyer in ordinary course of business . . . takes free of a security interest created by his seller even though perfected . . . ." *Id.* § 9–307.

Under section 9–306(2), "a purchaser . . . of collateral takes free of a security interest *whenever the debtor is authorized by the secured party to dispose of the collateral.*" *Poteau State Bank v. Denwalt,* 597 P.2d 756, 759 (Okl.1979) (emphasis in original). Authorization may be either explicit or implied. *Id.* at 759–60. The Bank's security agreement provided that OHT "may sell its inventory in the ordinary course of business."[5] Rec., vol. I, at 32. Charles Hyde, who serviced the OHT account for the Bank, testified that the Bank generally had allowed OHT to enter into contracts with its customers and to sell inventory without the Bank's supervision or permission. The only restriction placed upon OHT was that when the Bank made the supplementary loans to OHT secured by specific OHT accounts receivable, including the KTI progress payments, the customers involved were instructed to make their account payments directly to the Bank. Hyde also testified that the Bank knew OHT "did some of their jobs with customer-supplied materials." From his point of view "it was a blessing when they [did], because it eliminated some bank borrowing needs." Rec., vol. VI, at 114.

---

3. A purchase money security interest is a security interest
   "(a) taken or retained by the seller of the collateral to secure all or part of its price; or
   "(b) taken by a person who by making advances or incurring an obligation gives value to enable the debtor to acquire rights in or the use of collateral if such value is in fact so used."
   Okla.Stat. tit. 12A, § 9–107 (1981). The general rule is that priority between conflicting security interests in collateral is determined by priority in time of filing or perfection, or for unperfected interests, by time of attachment, *id.* § 9–312(5). However, § 9–312(3) established an exception to this general rule of first in time. Under § 9–312(3), the holder of a perfected purchase money security interest in inventory enjoys priority over conflicting security interests in the same inventory if the holder complies with certain procedures involv-

ing the giving of notice to competing secured parties. *Id.* See Comment, *"Bailment for Processing": Article Nine Security Interest or Title Retention Contract?* 61 Or.L.Rev. 441, 452–54 (1982) (arguing that such transactions are in effect buyer-financing devices intended to secure performance of contract and should be treated as Article Nine secured transactions).

4. *See generally* Comment, *supra* note 3.

5. The requirement in the Bank's security agreement that a sale by OHT must be in the ordinary course of its business is identical to § 9–307 which provides that a "buyer in the ordinary course of business" takes free of a third party's security interest in the goods. Okla.Stat. tit. 12A, § 9–307(1) (1981). The Bank points out in its brief on appeal that the similarity of this language is no coincidence.

The trial court found that the Bank permitted OHT to sell inventory to customers without restriction so long as the sale was in the ordinary course of business. It further found that OHT sold the Box Units in the ordinary course. The court concluded as a matter of law that the transaction was an authorized sale of goods under 9–306(2), and that KTI was therefore entitled to the Box Units free of the Bank's security interest.

The Bank contests as clearly erroneous the trial court's finding that a sale occurred in the ordinary course of business. Initially, we must determine if in fact a sale occurred. We must then decide whether any such sale was in the ordinary course of OHT's business and hence was authorized.

Article Nine section 9–105(3) incorporates the definition of "sale" found in Article Two section 2–106. There, a "sale" is defined as "the passing of title from the seller to the buyer for a price (Section 2–401)." Tit. 12A, § 2–106(1). Section 2–401 provides:

"Each provision of this Article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this Article and matters concerning title become material the following rules apply:

"(1) *Title to goods cannot pass under a contract for sale prior to their identification to the contract (Section 2–501),* and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by this act.... *Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.*"

*Id.* § 2–401 (emphasis added). Thus, there are two requirements that must be met

before title can pass within the meaning of section 2–106(1): the goods must be identified to the contract, and the parties must agree on when title passes.[6]

Under section 2–501, goods become identified to the contract as follows:

"The buyer obtains a special property and an insurable interest in goods by identification of existing goods as goods to which the contract refers even though the goods so identified are non-conforming.... *Such identification can be made at any time and in any manner explicitly agreed to by the parties. In the absence of explicit agreement identification occurs*

(a) when the contract is made if it is for the sale of goods already existing and identified;

(b) *if the contract is for the sale of future goods ... when goods are shipped, marked, or otherwise designated by the seller as goods to which the contract refers ...."*

Tit. 12A, § 2–501(1) (emphasis added). The contract between OHT and KTI did not set out the time and manner in which identification of the goods to the contract would occur. Therefore, identification occurred if OHT "marked, or otherwise designated" the goods as those "to which the contract refers." *Id.* OHT began fabrication of the Box Units from materials purchased by OHT or supplied out of OHT's inventory, and continued work on them until the plant was shut down. The trial court found that the Box Units, as well as the KTI Goods, were identified to the contract by the time the Bank took possession of them on January 30th. "[T]he general policy is to resolve all doubts in favor of identification," U.C.C. § 2–501(1) Official Comment 2, and "there is no requirement in [section 2–501] that the goods be in a deliverable state or that all of the seller's duties with respect to the processing of the goods be completed in order that identification occur," *id.* Official Comment 4. There is ample evidence in the record to support the trial court's conclusion

---

**6.** If the parties do not otherwise agree, "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods." Okla.Stat. tit. 12A, § 2–401 (1981).

that the Box Units and the KTI Goods had been identified to the contract.

With respect to passage of title, the contract between KTI and OHT specified that title to the KTI Goods would remain in KTI, and that title to goods procured by OHT for the contract would "pass to Purchaser on . . . any progress or other payment made by [KTI] to [OHT]." Rec., vol. I, at 77 (reverse). Payments were made by KTI on January 10, 1978, and on January 19. Accordingly, we hold that a sale of goods as defined by the UCC had occurred by the time the Bank seized the Box Units and the KTI Goods, the goods having been identified to the contract and title having passed for a price.[7] *See Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht, Hull No. 01*, 625 F.2d 44 (5th Cir.1980) (title to boat passed to buyer and sale occurred when boat although incomplete was identified to contract); *Draper v. Minneapolis-Moline, Inc.*, 100 Ill.App.2d 324, 241 N.E.2d 342 (1968) (sale occurred when tractor identified to buyer although no payments had been made and work on the tractor remained to be done); *Russell v. Transamerica Insurance Co.*, 116 Mich.App. 93, 322 N.W.2d 178 (1982) (title to boat passed when identified although not deliverable); *Holstein v. Greenwich Yacht Sales, Inc.*, R.I., 404 A.2d 842 (1979) (buyer obtained special property interest when boat identified to contract although incomplete).

The remaining question is whether the sale was in the ordinary course of OHT's business. The Bank argues strenuously that it was not, pointing out that OHT was exclusively a build-to-order metal fabrication shop that did not sell materials out of its stock but only sold finished goods built to the customer's specifications. The Bank then asserts that at the time any sale would have had to occur, the eight KTI furnace economizers were only "nuts and bolts," not completed goods. Therefore, the Bank concludes, there was no sale in the ordinary course of OHT's business.

The Bank's argument fails because when the sale occurred, KTI was not buying "nuts and bolts" or sheet steel out of OHT's inventory; it was buying eight heat economizers that had been identified to the contract. OHT's business consisted of custom fabricating steel pursuant to the terms of contracts with its customers. KTI contracted to buy custom-made goods from OHT, as was OHT's regular practice. The contract for sale was thus in the ordinary course. This was *not* a contract for sale of raw materials by OHT, which would not have been in OHT's ordinary practice, but was instead a contract for sale that typified OHT's business. So long as the goods were designated as those to be incorporated into KTI's eight furnace economizers, it is irrelevant that the fabrication was not complete.

Because this was a sale in the ordinary course of OHT's business, and, as such, was authorized by the Bank's security agreement, KTI took the goods free of the Bank's security interest.[8] Tit. 12A, § 9–306(2). *See, e.g., Jones v. One Fifty Foot Gulfstar Motor Sailing Yacht, Hull No. 01*, 625 F.2d 44; *Draper v. Minneapolis-Moline, Inc.*, 100 Ill.App.2d 324, 241 N.E.2d 342; *Holstein v. Greenwich Yacht Sales, Inc.*, R.I., 404 A.2d 842. Accordingly, we hold that KTI was entitled to the KTI Goods and the Box Units under tit. 12A, § 9–306(2). We therefore affirm the trial court's conclusion that the Bank's actions constituted a conversion of the KTI Goods and the Box Units.

### III.

### DAMAGES

The trial court awarded KTI judgment in the amount of $156,272.30, as the value of

---

7. As we have noted, title to the KTI Goods remained at all times in KTI. Nevertheless, OHT had "rights in the collateral" sufficient to support the grant to the Bank of a security interest in the KTI Goods. When both the KTI Goods and the Box Units became identified to the contract for the purchase of the eight heat economizers and the progress payments were made, we believe a "sale" of the eight heat economizers occurred within the meaning of the Code.

8. The foregoing analysis indicates that even if this were not an "authorized sale" under § 9–306(2), KTI would have taken the Box Units free of the Bank's security interest as a buyer in ordinary course under § 9–307(1).

the goods at the time of the conversion, plus interest. The Bank protests, arguing that at most KTI is entitled to recover $95,000, the amount that KTI paid the Bank to recover the goods.

■ The general measure of tort damages in Oklahoma is "the amount which will compensate for all detriment proximately caused thereby." Okla.Stat. tit. 23, § 61 (1981). *See First State Bank v. McKiddy,* 206 Okl. 57, 240 P.2d 1103, 1107 (1952); *Denco Bus Lines v. Hargis,* 204 Okl. 339, 229 P.2d 560, 562 (1951). The injured party is to be placed "as nearly as may be in the situation which he would have occupied had not the wrong been done." *Midland Valley Railroad v. Barton,* 191 Okl. 359, 129 P.2d 1007, 1010 (1942).

In actions for conversion of personalty, "[t]he detriment caused by the wrongful conversion . . . is presumed to be: 1. The value of the property at the time of the conversion with the interest from that time . . . ." Okla.Stat. tit. 23, § 64 (1981). Section 64 is a definitional statute designed to augment section 61, rather than one establishing an independent measure of damages for the tort of conversion. *See Jones v. United States Fidelity & Guaranty Co.,* 589 P.2d 704, 707–08 (Okl.Ct.App.1978).

The presumption established by section 64 is generally rebuttable, but it "cannot be repelled in favor of one whose possession was wrongful from the beginning, by his subsequent application of the property to the benefit of the owner, without his consent." Okla.Stat. tit. 23, § 65 (1981). The trial court held that the Bank's possession of the goods was not wrongful from the beginning within the meaning of section 65, and accordingly found that section inapplicable.[9] Rec., vol. I, at 256. Nevertheless, the court held that the Bank was not entitled to "equitable mitigation" of damages because the Bank had forced KTI to pay it

in order to receive the goods. *Id.* at 257. The court thus concluded that KTI should recover the full value of the goods as damages. KTI and the Bank had stipulated that the replacement value to KTI of the goods converted by the Bank was $156,-272.30.

■ We must determine under section 61 whether the damages awarded to KTI correctly compensated KTI for all detriment proximately caused KTI by the Bank's conversion. *Denco Bus Lines,* 204 Okl. at 341, 229 P.2d at 562. Under section 64(1), the stipulated value of the goods is presumed to be the measure of detriment suffered by KTI. However, the Bank contends that the presumption is rebutted by the fact that KTI gained possession of the goods for $95,000. We agree. When an owner recovers converted property, the measure of damages assessed against the converter should be reduced by the value of the property regained. *National Motor Service Co. v. Walters,* 85 Idaho 349, 379 P.2d 643, 651 (1963). *See* Restatement (Second) of Torts § 922(1). At the close of the transaction, KTI had been restored to its prior position with respect to ownership and enjoyment of the goods, but had been injured in the amount of $95,000 by the Bank's conversion. This, accordingly, is the amount of damages necessary to make good KTI's actual loss.

Unlike the trial court, we do not believe that KTI is entitled to damages in excess of its loss because the Bank forced KTI to purchase its own goods. This case is unlike *Dakota Gardens Apartment Investors "B" v. Pudwill,* 142 Cal.Rptr. 126, 75 Cal.App.3d 346 (1977), relied on by the trial judge. There the converter had applied the plaintiff's funds without its consent to a debt, the payment of which benefited the converter as well as the plaintiff. The court refused to reduce the value of the converted property (the funds) by the amount paid on the debt because

---

**9.** KTI suggests that "a finding that the Bank's possession was wrongful from the beginning would be justified." Brief of Plaintiff-Appellee at 30. The trial court found that OHT was rightfully in possession of the goods when it gave the Bank the keys to the plant; conse-

quently, the Bank's possession was proper at that time. It further found that the Bank's possession did not become wrongful until KTI demanded possession and the Bank refused. The record supports the trial court's holding, and we will not disturb it on appeal.

"a defendant generally cannot diminish the amount of damages by paying a debt of the injured party without the latter's consent. (Restatement of Torts, § 923). . . . To allow mitigation by application of the converted property to the benefit of the injured party would result in the converter dictating to the owner how the owner's property is to be used." 142 Cal.Rptr. at 129, 75 Cal.App.3d at 352–53 (citations omitted).

Here, KTI not only consented to the return of the property, it very much wanted the return because the goods were unique and were necessary to its performance of a contract with a third party. KTI's objection was not to the return of the property but to the fact that it was required to pay for it. Under these circumstances, "[t]he amount of damages for the conversion of a chattel is diminished by its recovery or acceptance by a person entitled to its possession." Restatement (Second) of Torts § 922(1).

We have considered the parties' remaining arguments and find them without merit. This case is reversed in part, affirmed in part, and remanded for entry of judgment in the amount of $95,000 plus interest.