HARTFORD NATIONAL BANK AND TRUST COMPANY *v.* ESSEX YACHT SALES, INC., ET AL.
(2879)
(2880)

HULL, BORDEN and DALY, Js.

Argued February 8—decision released May 14, 1985

*Paul W. Orth,* with whom was *Patricia B. Perkins,* for the appellant-appellee (plaintiff).

*William F. Gallagher,* with whom, on the brief, were *Elizabeth A. Gallagher* and *Joseph Trotta,* for the appellee-appellant (named defendant).

*Lawrence M. Lapine,* with whom, on the brief, was *Robert S. Bello,* for the appellee (intervening defendant).

BORDEN, J. The plaintiff, Hartford National Bank and Trust Company (HNB), appealed[1] from the judgment of the trial court in favor of the intervening defendant, First Pennsylvania Bank, N.A. (Pennsylvania), on the second count of the complaint,[2] and on

___

[1] This appeal, originally filed in the Supreme Court, was transferred to this court. General Statutes § 51-199 (c).

[2] On the first count, a judgment was rendered for HNB against the named defendant, Essex Yacht Sales, Inc. That judgment was for the amount owed to HNB by Essex and is not before us on appeal.

Pennsylvania's counterclaim and cross complaint. Those pleadings involved the issue of the priority of HNB's security interest in certain boats as collateral over Pennsylvania's competing security interest in the same collateral. The named defendant, Essex Yacht Sales, Inc. (Essex), appeals separately from the judgment of the trial court in favor of HNB on Essex's counterclaim. That counterclaim sought damages from HNB for malicious and excessive attachment of Essex's boats. We find error on HNB's appeal and no error on Essex's appeal.

The court found the following facts: Essex was in the business of selling yachts at retail. In 1978, its incorporators borrowed $60,000 from HNB which was used as Essex's initial capital. On February 20, 1979, Essex guaranteed the note evidencing that loan and, to secure its obligation, executed a security agreement with HNB covering all of its present and after-acquired inventory.[3]

Meanwhile, to facilitate its business of acquiring yachts for sale and selling yachts, Essex was engaged in financial arrangements with several other lenders, one of which was Pennsylvania. In January, 1979, an officer of Pennsylvania called HNB to inquire about HNB's loan arrangement with Essex, and told HNB that Pennsylvania intended to enter into a purchase money mortgage, or floor plan, arrangement with Essex. On February 9, 1979, eleven days prior to the execution of its security agreement with HNB, Essex entered into such a floor plan arrangement with Pennsylvania, in connection with which Essex, to secure its obligation to Pennsylvania, executed a security agree-

---

[3] The security agreement provided in part: "Except pursuant to this Agreement, no financing statement has been filed with respect to the Collateral, [Essex] is the absolute and undisputed owner of the Collateral . . . . " The agreement also recognizes, subject to the security interest of HNB, the normal incidences of such ownership by Essex, such as insurability of the collateral.

ment covering all of its present and after-acquired inventory.[4]

Both HNB and Pennsylvania mailed financing statements to the office of the secretary of the state. Both statements arrived in the morning mail of February 22, 1979, were processed in the usual manner and were stamped as having been accepted for filing. HNB's statement was stamped in at 11:45 a.m., Pennsylvania's at 11:51 a.m.

In July, 1980, Essex defaulted on the note to HNB. HNB thereupon filed this replevin action in order to enforce its security interest, and seized nine boats which were in the possession of Essex. These boats constituted the entire inventory of Essex, which thereupon went out of business. In connection with its replevin action, HNB filed a bond and an accompanying affidavit that the value of the boats seized was $100,000. See General Statutes § 52-518. The true value of the boats was far more, a fact of which HNB was aware at the time. Pennsylvania intervened as a defendant in the replevin action, claiming a security interest in the seized boats.[5]

Ultimately, HNB filed a revised complaint in two counts, seeking possession of the boats and damages.

---

[4] This security agreement provided in part: "[Essex] ('Borrower'), to secure the obligations described below, hereby grants to [Pennsylvania] . . . a mortgage upon and a security interest (both interests being referred to below as a 'security interest') in the following Inventory: all boats and Marine related equipment now owned or hereafter acquired . . . . Borrower . . . warrants that, except for interests disclosed to [Pennsylvania] in writing before the execution of this Agreement, the Goods are free from any ownership interest except that of the Borrower. . . . Borrower may sell the Goods in the usual course of business for customary prices, and not otherwise, and immediately after any sale if [Pennsylvania] shall require it shall deliver to [Pennsylvania] either (a) the proceeds of such sale . . . or (b) an amount equal thereto to be applied to the payment of Borrower's indebtedness to [Pennsylvania] at the time . . . ."

[5] During the litigation, HNB and Pennsylvania stipulated to release the boats to Pennsylvania, which filed a bond of $90,000.

The first count was directed against Essex. The second count, which was directed against Pennsylvania, asserted the priority of HNB's security interest over that of Pennsylvania. Pennsylvania filed a counterclaim against HNB and a cross complaint against Essex, claiming the priority of its security interest in the boats over that of HNB, and seeking possession of the boats and damages. Essex filed a counterclaim against HNB for damages, alleging that HNB's "attachment," meaning the replevin, of its entire inventory was knowingly excessive and was a wilful and malicious effort to put Essex out of business.

As to the dispute between HNB and Pennsylvania, the trial court found that Essex had signed HNB's security agreement, which contained an adequate description of the collateral, that HNB gave value, and that the earlier stamping of HNB's financing statement governed over the later stamping of that of Pennsylvania. It also found, however, that under Pennsylvania's arrangement with Essex and the manufacturer of seven of the nine boats in question, Pennsylvania held title to those seven boats. When a boat was to be sold by Essex, Pennsylvania would transfer title directly to the purchaser. At no time was title vested in Essex. The court therefore concluded that, except for two of the boats, and despite Pennsylvania's security agreement to the contrary; see footnote 4, supra; Essex never acquired any rights in those seven boats, and that, therefore, pursuant to General Statutes § 42a-9-203, HNB's security interest did not attach to them. On the basis of these conclusions, on the second count of HNB's complaint, which was against Pennsylvania, on Pennsylvania's counterclaim against HNB and on Pennsylvania's cross complaint against Essex, the trial court rendered judgment in favor of HNB as to two of the boats only and in favor of Pennsylvania as to the other seven boats. HNB appealed from that judgment.

As to Essex's counterclaim against HNB, the court found, inter alia, that in seizing the property in Essex's possession HNB was motivated by reasonable commercial concern and that Essex had failed to prove that HNB's replevin was either excessive or malicious. The court therefore rendered judgment in favor of HNB. Essex appealed from that judgment.

I

We first consider HNB's appeal. HNB argues that the court erred in concluding that its security interest did not attach to the seven boats in question. We agree.

Subject to certain exceptions not applicable here, under the Uniform Commercial Code[6] "a security interest is not enforceable against the debtor or third parties with respect to the collateral and does not attach unless: (a) . . . the debtor has signed a security agreement which contains a description of the collateral . . . (b) value has been given; and (c) the debtor has rights in the collateral." General Statutes § 42a-9-203 (1). No question is raised on appeal as to Essex's signing of HNB's security agreement, the description of the collateral, the value given or the temporal priority of HNB's financing statement. The sole issue involves whether Essex had rights in the collateral.

The trial court erred by focusing on the locus of the title to the collateral and concluding, from that locus, that Essex lacked rights in its after-acquired inventory

---

[6] We note that, although it was not raised by the parties, the trial court in its memorandum of decision raised the question of whether the priorities of the competing security interests should have been determined pursuant to the federal Ship Mortgage Act of 1920; 46 U.S.C. §§ 911-984; rather than Connecticut's version of the Uniform Commercial Code. Noting, however, that all the documents and pleadings of the parties relied on the Code and that the parties had proceeded thereunder, the court wisely concluded that article 9 of the Code, which is "known and may be cited as Uniform Commercial Code—Secured Transactions"; General Statutes § 42a-9-101; governed. We do likewise. *Trivalent Realty Co.* v. *Westport,* 2 Conn. App. 213, 215 n.4, 477 A.2d 140 (1984).

which was subject to HNB's security interest. In doing so, the court ignored the cardinal principle underlying article 9 that "[e]ach provision of this article with regard to rights, obligations and remedies applies whether title to collateral is in the secured party or in the debtor." General Statutes § 42a-9-202, entitled "Title to collateral immaterial." "The rights and duties of the parties to a security transaction and of third parties are stated in this Article without reference to the location of 'title' to the collateral." U.C.C. comment, Conn. Gen. Stat. Ann. § 42a-9-202 (West 1960). "Title to goods is of little relative consequence under the . . . Code . . . . A deliberate effort was made by the drafters of the Code to avoid defining the rights of parties to goods in terms of who has title . . . . " *Morton Booth Co.* v. *Tiara Furniture, Inc.,* 564 P.2d 210, 212 (Okla. 1977); *Kinetics Technology International Corporation* v. *Fourth National Bank,* 705 F.2d 396, 399 (10th Cir. 1983) (Article 9 designed to prevent legal consequences flowing from manipulation of title). The arrangement in this case among Essex, Pennsylvania and the boat manufacturer is precisely the kind of manipulation of title to which article 9 denies legal consequences.

The Code does not define the term, "rights in the collateral"; *In re Pubs, Inc.,* 618 F.2d 432, 436 (7th Cir. 1980); except to say that " '[r]ights' include remedies." General Statutes § 42a-1-201 (36). "The cases generally hold, however, that where a debtor gains possession of collateral pursuant to an agreement endowing him with any interest other than naked possession, the debtor has acquired such rights as would allow the security interest to attach. *In re Samuels & Co., Inc.,: Stowers* v. *Mahon,* 526 F.2d 1238 (5th Cir. 1976); *First National Bank of Elkhart County* v. *Smoker,* Ind. Ct. App., 11 U.C.C. Rep. 10 (1972); *Evans Products Co.* v. *Jorgensen,* 245 Or. 362, 421 P.2d 978 (1966)." *Morton*

*Booth Co.* v. *Tiara Furniture, Inc.,* supra, 214; *Kinetics Technology International Corporation* v. *Fourth National Bank,* supra, 399; see also *State Bank of Young America* v. *Vidmar Iron,* 292 N.W.2d 244 (Minn. 1980).

The facts found by the trial court and the undisputed documents compel the conclusion that Essex had rights in the collateral. Essex was in the business of acquiring and selling yachts. These boats were its inventory, acquired and held by it for the purpose of sale in the course of its business. Pennsylvania's security agreement with Essex recognized the right of Essex to sell the boats in the usual course of its business. See footnote 4, supra. HNB's security agreement recognized Essex as the owner of the boats. See footnote 3, supra. Indeed, it is difficult to conceive of a clearer or more classic case of a debtor having "rights in the collateral" pursuant to General Statutes § 42a-9-203. Of course, the fact that Essex may not have owned or had possession of the boats when it executed the security agreement with HNB is of no moment under the Code. "A person holding a security [agreement] which includes a clause adding after-acquired property as collateral takes a security interest in the after-acquired property upon its acquisition by the debtor." (Footnote omitted.) 4 Anderson, Uniform Commercial Code (2d Ed.) § 9-204:7.

Ordinarily this conclusion would simply mandate a judgment for HNB. Here, however, HNB and Pennsylvania stipulated that, pending the litigation, the boats would be released to Pennsylvania; see footnote 5, supra; and we were informed at oral argument that, pursuant to that release, Pennsylvania has sold the boats. Thus, HNB's security interest has by their agreement attached to the proceeds of the sale. Our remand, therefore, will require further proceedings between HNB and Pennsylvania.

On the plaintiff's appeal, there is error in the judgment on the second count of the complaint and on the intervening defendant's counterclaim and cross complaint; that judgment is set aside and the case is remanded with direction to render judgment for the plaintiff in an amount to be determined in further proceedings consistent with this opinion.

## II

The separate appeal of Essex, from the judgment of the trial court in favor of HNB on Essex's counterclaim, requires little discussion. The entire thrust of the appeal is that the court erred by not finding that Essex had proved a claim for tortious interference with its business, because it proved that, in obtaining the "attachment," HNB acted both maliciously and fraudulently. The trial court read the counterclaim as alleging a wilful and malicious excessive attachment. If we assume arguendo that this amounted to a claim for tortious interference with business, rather than the different tort of abuse of process; see Wright & FitzGerald, Connecticut Law of Torts (2d Ed.) §§ 163, 165; Essex's argument is without merit.

The court found that in seizing the boats HNB was motivated by reasonable commercial concern, that the attachment was not excessive and that it was not done with malice. It also found that Essex's note to HNB had been in default for some time, the original obligors were no longer in the business, Essex was in financial trouble, its inventory had just been released from another attachment, and HNB was concerned about the priority of its security interest over that of Pennsylvania. These findings, which are not clearly erroneous, are fatal to Essex's claim of malice.

Essex's claim of fraud is of even less avail. It is a claim which was not pleaded, litigated, or even referred

to in Essex's preliminary statement of issues on appeal. We therefore do not consider it. *Leabo* v. *Leninski,* 2 Conn. App. 715, 728, 471 A.2d 670 (1984).

On the appeal by the defendant Essex Yacht Sales, Inc., there is no error.

In this opinion the other judges concurred.