Edwin SEIBERT, Appellant,

v.

Joann NOBLE, Administrator for the Estate of Daryl Noble; Bohrofen Implement Co., Inc., and Brenton State Bank, Appellees.

No. 92–65.

Supreme Court of Iowa.

April 21, 1993.

R. Jeffrey Lewis and S.P. DeVolder of Gamble & Davis, Des Moines, for appellant.

Richard G. Santi and Steven L. Serck of Ahlers, Cooney, Dorweiler, Haynie, Smith & Allbee, P.C., Des Moines, for appellees Noble and Bohrofen.

Gary A. Norton and Rodney P. Kubat of Whitfield & Eddy, Des Moines, for appellee Brenton State Bank.

Considered by HARRIS, P.J., and LARSON, SCHULTZ, LAVORATO, and ANDREASEN, JJ.

SCHULTZ, Judge.

This is a multi-count action by the owner of farm implements seeking damages from an implement dealer and a bank for the wrongful sale of the implements and the application of the proceeds to pay the owner's debt and the cost of sale. The owner, Edwin Seibert (Seibert), commenced this action against Daryl Noble, Bohrofen Implement Company, Inc., owned by Noble and his wife Joann, and the Brenton State Bank (bank). Following Noble's death, his estate was substituted as a defendant. Because the interest of Noble and Bohrofen are similar, we shall simply refer to them as Noble. The action against the bank was dismissed following a summary judgment motion and the action against Noble was dismissed following a jury trial. We affirm.

Seibert engaged in custom farming and sharecropping from 1969 until the end of 1985. He had been a long-time customer of Noble and purchased several farm implements on credit, signing notes and security agreements. Over the years, Noble helped prevent Seibert from defaulting on notes by "rolling over" previous notes. In 1984, Seibert executed a new note for $28,650 and a security agreement covering three tractors and five other implements which Noble assigned to the bank subject to recourse. In 1985, Seibert became a full-time over-the-road trucker.

Following the termination of his farming activities, Seibert made partial payments on the notes in 1986 and 1987 and made no payment in 1988. In 1988, $11,200, plus interest, was due on the note. Noble and Seibert met to discuss how Seibert was going to cure the defaults. Prior to this, Seibert had sold a tractor, pledged as security on the 1984 note, and paid only part of the proceeds to the bank. As a result of the meeting, Seibert signed a new note and security agreement which included two used combines as additional collateral. Seibert's understanding was that Noble would attempt to convince the bank to accept the new note in payment of the 1984 note.

On January 25, 1989, Noble and Seibert met and discussed what would happen if the bank refused to accept the 1989 note. Noble believed the parties had reached an understanding whereby, if the bank was not agreeable to the substitution, Noble would pick up and offer for sale all collateral listed on the 1984 security agreement, plus the two combines, to pay off the 1984 note. Seibert testified that he had agreed that the implements could be picked up and placed for sale. The parties disagree on whether Noble needed to consult with Seibert about the selling price for each implement prior to sale. Although there is some dispute concerning whether Noble actually pressed the bank to accept the 1989 note, the bank never accepted the note.

In February 1989 and into the summer, Noble picked up two tractors and an auger listed in the 1984 security agreement and the two used combines. Noble had called Seibert's housemate and Seibert admittedly knew that the implements were picked up and were being sold. Without consulting Seibert as to the acceptability of the sale price, Noble made the following sales:

| Date | Machines | Sale Price |
|------|----------|------------|
| May 2 | 1976 Oliver Tractor | $ 5,450 |
| September 12 | Grain Auger | $ 800 |
| September 23 | TR70 Combine | $ 5,000 |
| November 14 | 1972 Oliver Tractor | $ 3,250 |
| December 26 | Combine | $ 1,250 |
| | | $15,750 |

Following each sale, Noble applied the proceeds on Seibert's debt to the bank. Seibert had his lawyer check with Noble to document the sale prices before the last two implements were sold. After the fourth sale of a secured tractor, November 14, the debt was satisfied and Noble retained the balance of $330 from that sale plus $1,250 from the sale of the last combine. Noble retained $1,576.65 for repairs, merchandise, and hauling expenses and shortly before trial paid Seibert the balance of $3.71, plus interest.

· Seibert waited until the implements were sold and then commenced this action. Relevant to this appeal, Seibert's action against Noble and the bank involved separate counts alleging conversion, fraud, and violation of Article 9 of the Uniform Commercial Code. Seibert claimed compensable and punitive damages.

The district court, Judge Michael J. Streit, granted the bank's motion for summary judgment because the bank did not participate in, or authorize the repossession or sale of Seibert's implements. Seibert's action against Noble was tried to a jury, Judge Darrell J. Goodhue presiding. Seibert presented evidence concerning the inadequacy of the sale prices and his lost profits resulting from an alleged wrongful taking and sale of the implements. Noble presented evidence concerning the adequacy of the sale price and Seibert's lack of damages.

The trial court instructed the jury on Seibert's claim of conversion and his alternative claim that even if he had consented to the sale, Noble did not follow the agreement of the parties. The jury answered interrogatories finding there had been a wrongful taking, but no damages were sustained, and there was no breach of an

agreement of the parties. The court entered judgment against Seibert.

On appeal of his claims against Noble, Seibert challenges the court's instruction on damages arising from a conversion, its refusal to instruct on fraud and commercial code claims, and the dismissal of his punitive damage claim. Seibert also claims error on the summary judgment ruling dismissing his claims of conversion and commercial code violation against the bank.

■ I. *Instruction on damages.* The trial court submitted instructions to the jury on the claim of conversion. Instruction No. 13 provides:

> The measure of damages for wrongful taking and sale of implements is:
>
> 1. The difference between the fair market value of the implement at the time of the taking and sale and the actual sale price.
>
> 2. Any other damages plaintiff sustained as a proximate cause of the taking and sale.
>
> Plaintiff has the burden to prove the fair market value of each implement and any other damages he may claim.

At the appropriate time Seibert made this record:

> Plaintiff excepts and objects to instruction No. 13 on the basis that it allows defendant an offset for the actual sale price, which under conversion, I think the doctrine has established that a third party who converts equipment is not entitled to a reduction or an offset in sales price, even if that money is applied to a debt owed by the party who owned the converted equipment....

Because Noble concedes Seibert has preserved error by his objections to the instructions, any claim concerning error preservation is waived.

Seibert contends the court incorrectly instructed the jury to deduct the sale proceeds from the fair market value of the implements. Seibert contends a converter may not claim mitigation of damages by application of the proceeds to a debt of the plaintiff. Noble urges that a converter, who applies the proceeds to discharge a debt secured by the property, gets a credit for the amount of the debt discharged. No claim was made, nor do we decide, whether mitigation or offset should have been pled and proved by Noble as a defense or counterclaim. *See F.S. Credit Corp. v. Shear Elevator Inc.,* 377 N.W.2d 227, 233 (Iowa 1985). ("[M]itigation of damages is a special defense which must be pled and proved by the defendant ... or the defendant is limited to circumstances growing out of the plaintiff's testimony.")

We have previously indicated that damage mitigation principles are applicable in conversion actions. *Id.; Welke v. City of Davenport,* 309 N.W.2d 450, 453 (Iowa 1981); *see Johnson v. Tantlinger,* 31 Iowa 500, 502–03 (1871). We have not decided the issue of whether a converter may mitigate damages by applying the proceeds of the property on a debt secured by a lien owed to a third person.

To fortify his position, Seibert cites *Walters v. Alden State Bank,* 155 Mich.App. 29, 399 N.W.2d 432, 436 (1986), and *Dakota Gardens Apartment Investors "B" v. Pudwill,* 75 Cal.App.3d 346, 354, 142 Cal. Rptr. 126, 129 (1977). The court in *Walters* stated:

> At common law, a defendant who converts may not claim mitigation of damages by showing that he has applied the converted property or its proceeds to a debt owed by a plaintiff to a third party unless a plaintiff assents to that application as a credit.

399 N.W.2d at 436. Neither case involves payments by a converter to a creditor of plaintiff holding a security interest in the property converted. In *Dakota Gardens,* the court specifically notes that exceptions to the rule of no mitigation "involve cases where the application of the property is compelled by a legal duty, such as liens or security interests." 75 Cal.App.3d at 354, 142 Cal.Rptr. at 129–130.

■ We believe that the proper rule is that a converter may claim mitigation in instances where the proceeds from a sale are applied to a specific debt that the proceeds were intended to discharge. *Yeager & Sullivan, Inc. v. Farmers Bank,* 162

Ind.App. 15, 317 N.E.2d 792, 799–800 (1974); 18 Am.Jur.2d *Conversion* § 128 (1985). Thus, conversion damages are mitigated by the application of the proceeds from a sale to satisfy a lien on the converted property. *Coffel v. Perry,* 452 N.E.2d 1066, 1069 (Ind.App.1983).

With these principles in mind, we turn to the record before us. Seibert testified that Noble had authority to pick up the implements, place them for sale and to pay the sale proceeds on his obligation to the bank. Seibert also testified, however, it was agreed that Noble was to contact him prior to any sale to obtain his consent to the sale price. The jury found that there was a conversion. Noble applied the sales proceeds to the specific debt at the bank and was entitled to claim mitigation for these payments. We hold the court's instruction in allowing mitigation to the extent of Noble's payments to the bank was proper.

■ We must still address the issue of whether the instruction was improper because it allowed Seibert's damages to be mitigated by Noble's sale expenses. Seibert contends Noble cannot benefit from the wrongful act of conversion by a self-help collection of his expenses. Although Seibert raises this issue for the first time on appeal, we will address it.

We would agree that the rule of mitigation is equitable in nature and generally is applicable to one who seizes the property without authority and uses the proceeds to pay a debt due him. 18 Am.Jur.2d *Conversion* § 128 (1985). We followed this rule where we held a defendant who wrongfully executed on a corn crop subject to a chattel mortgage "is not entitled to compensation for husking and cribbing, notwithstanding those acts may have increased the value of the property." *Stuart v. Phelps,* 39 Iowa 14, 18 (1874). The present case may be distinguished from the general rule and that of *Stuart* because Noble held the implements under authority and performed the services, except possibly for a delivery

expense,[1] before he converted the property by a sale without prior permission.

We believe one of our later cases is applicable to these facts. In determining the obligation under a replevin bond, given to obtain possession of wheat, the court allowed the party who wrongfully replevined the grain to deduct the cost of threshing and marketing expenses from the value of the wheat. *Clement v. Duffy,* 54 Iowa 632, 635–36, 7 N.W. 85, 86 (1880). We reviewed authority from trover actions and distinguished *Stuart* on the basis of a willful trespass. *Id.* at 635, 7 N.W. at 86. We limited the rule preventing wrong-doers from recovering labor costs to "willful wrong-doers." *Id.,* 7 N.W. at 86. As we will point out in our discussion of punitive damages, Noble did not act in willful disregard of Seibert's rights. Under the record before us, we hold the allowance of mitigation of damages in Instruction No. 13, to the extent of Noble's expenses, was not error.

II. *Other claims against Noble.* Seibert complains that the trial court failed to instruct the jury on fraud, commercial code violations and punitive damages. We find no merit in these complaints.

A. *Fraud.* In his petition, Seibert alleged that Noble committed fraud by requiring him to sign in blank the 1989 note and financing statement. Among the elements of fraud is an intent to deceive, which the other party relies upon with resulting damages to the relying party. *Bates v. Allied Mut. Ins. Co.,* 467 N.W.2d 255, 260 (Iowa 1991). Seibert admitted that Noble never promised that the bank would accept the 1989 note in replacement of the 1984 note. There was no reliance by Seibert resulting in damage to him. The trial court correctly concluded there was no substantial evidence in the record to submit the issue of fraud.

B. *Commercial code violations.* Seibert maintains that Noble took and sold the implements under authority of the 1989 promissory note and security agreement.

1. Seibert urges that $200 of the delivery expense of a tractor duplicated a payment for the expense by the buyer. Seibert rather than Noble, received credit for the buyer's payment as a payment of his debt to the bank.

He raised claims as to consent and notice required by Iowa Code chapter 554. Our review of the evidence indicates that the 1989 note and security agreement were orally conditioned on the bank's acceptance of them; an event which did not occur. Seibert described the 1989 note and security agreement as "in the trash." The trial court correctly determined there was a lack of substantial evidence that the possession and sale of the property was accomplished pursuant to a security agreement.

C. *Punitive damages.* Punitive damages should only be a fact in question when it is shown that the wrongdoer's acts constituted a willful and wanton disregard to the rights and safety of another, or that personal spite, hatred, or ill-will existed. Iowa Code § 668A.1; *Barnhouse v. Hawkeye State Bank*, 406 N.W.2d 181, 184 (Iowa 1987). Seibert testified that he did not believe Noble was motivated by ill-will or lied to him. The trial court properly removed this issue from the jury.

III. *Summary judgment in favor of bank.* Seibert's action against the bank contains the same counts sought against Noble, plus additional counts not in issue on appeal. Seibert alleged Noble acted as agent of the bank in the execution of the 1989 transactions, the repossession and sale of the implements. The bank sought and obtained summary judgment by urging the undisputed facts show that Noble was not its agent. Further, the bank claimed it was not a party to the execution of the 1989 note between Noble and Seibert and the subsequent repossession and sale of the implements.

Seibert urges an issue of fact was present because the bank had conversed with Noble, received the proceeds of the sales, knew the sources of the proceeds were Seibert's implements, and applied the proceeds on the debt. Seibert urges this information and a reasonable inference drawn from it, show the bank knew of and participated in the conversion.

We reject this contention. Our review of the record does not show a genuine issue of fact on the claim of agency. While the issue of agency is ordinarily a fact question, there must be more than a scintilla of evidence. *Chariton Feed & Grain Inc. v. Harder*, 369 N.W.2d 777, 789 (Iowa 1985). Noble testified in his deposition that he did not discuss repossession of Seibert's implements with the bank; the bank did not want to repossess Seibert's implements. The bank did not instruct, consent, offer, permit or otherwise authorize the repossession of Seibert's equipment. In our opinion, the fact that Noble deposited the checks from the proceeds in his own account and then paid a like amount on Seibert's debt does not permit an inference of either expressed or implied agency.

IV. *Summary.* We hold that judgments against Seibert should be affirmed.

**AFFIRMED.**