Filed 6/25/21 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| GATEWAY BANK, F.S.B.,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>POPPI METAXAS,<br><br>     Defendant and Appellant. | A158793<br><br>(San Mateo County<br>Super. Ct. No. CIV 534510)<br><br>ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING [NO CHANGE IN JUDGMENT] |

BY THE COURT:

The opinion filed herein on June 3, 2021, is modified as follows:

1. On page 2, lines 5 and 6 are deleted and the following is substituted:

   because Metaxas had no alternative but to approve the wire transfer and the wire transfer caused no damage. We reject both arguments and affirm.

2. On page 5, line 2 is deleted and the following is substituted:

   Gateway was liable to Metaxas for attorney fees and costs.[2]

1

3. On page 23, the first two lines of footnote 10 are deleted and the following is substituted:

> Metaxas's citation to comment f. omits the language that follows her quotation, which is:

These modifications do not effect a change in the judgment.

The petition for rehearing is denied.

Date: _6/25/21_                    <u>Richman,</u> Acting P.J.

Trial Court: San Mateo County Superior Court

Trial Judge: Honorable Robert Baines

Attorney for Plaintiff and Respondent, Gateway Bank, F.S.B.:
Kirschenbaum Law, PC, Jeffrey B. Kirschenbaum, Raymond E. Loughrey, Kristin L. Williams

Attorney for Defendant and Appellant, Poppi Metaxas:
Katz Appellate Law, Paul J. Katz.

Filed 6/3/21 (unmodified version)
**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| GATEWAY BANK, F.S.B., Plaintiff and Respondent, v. POPPI METAXAS, Defendant and Appellant. | A158793 (San Mateo County Super. Ct. No. CIV 534510) |


Appellant Poppi Metaxas was the president and chief executive officer of Gateway Bank (Gateway or the bank) in 2008 when the subprime mortgage market collapsed, leading to the financial crisis. Following their examination of Gateway, federal regulators categorized it as a "troubled institution," and in response the bank set out to raise more capital and deal with its troubled assets. Certain transactions caused the regulators to be suspicious, leading to a lengthy investigation. Along the way, the United States Attorney also became involved, causing another investigation, which culminated in Metaxas being indicted—and in 2015 to her pleading guilty to conspiracy to commit bank fraud.

Shortly thereafter, the bank sued Metaxas based on two transactions involving Ideal Mortgage Brokers: (1) a March 2009 $3.65 million working capital loan; and (2) a November 2009 $757,000 wire transfer. Following a lengthy trial, the court-appointed referee found for the bank, awarding it $250,000 in tort of another damages arising from "the fallout" from the first

1

transaction, and $132,000 in damages for the second.  Metaxas appeals, asserting two arguments:  (1) the tort of another damages must be reversed because the first transaction resulted in "substantial benefit" (Rest.2d Torts, § 920) to Gateway, and (2) the award for the second transaction was error because Metaxas had no alternative but to approve the wire transfer.  We reject both arguments and affirm.

## BACKGROUND

### The Parties and the General Setting

Plaintiff and respondent Gateway is a community bank headquartered in Oakland.

Defendant and appellant Poppi Metaxas joined Gateway in 1993 as a compliance officer.  She was quickly promoted, to the dual position of chief compliance officer and chief lending officer, and promoted again in 1996, to president and chief executive officer (CEO).  She also became a member of the Board of directors.

In 2008, the subprime mortgage market collapsed, and widespread defaults caused a chain reaction leading to a global financial crisis.  It was a challenging time in the banking industry, and regulators pressured banks to improve their balance sheets.  Gateway was no exception, and it became the subject of federal oversight.

The federal regulatory body overseeing Gateway was the Office of Thrift Supervision (OTS), an agency of the Department of Treasury.  Following its examination, in late 2008 the OTS advised Gateway officials that the bank's financial condition had to be improved, and in February 2009, the OTS issued its formal conclusions and rating, categorizing the bank as a "troubled institution."

In response, the bank's Board embarked on a campaign to raise more capital and shed many of its "troubled assets," which consisted of real property Gateway had acquired through foreclosure (known as real estate owned or "REOs") and non performing loans ("NPLs") in various stages of default. What the bank—and Metaxas—did in connection with the effort became the subject of a lengthy investigation, as set forth in detail below. Suffice to say here that the investigation led to the OTS demanding in early 2010 that Gateway fire Metaxas, who in fact left the bank in May. The OTS investigation continued.

Then, in 2011, a New York Federal Grand Jury issued a subpoena to Gateway requiring documents and testimony, which resulted in an additional investigation, one that lasted several years. This investigation led to a March 2014 indictment charging Metaxas with three crimes: (1) conspiracy to commit bank fraud; (2) bank fraud; and (3) perjury, lying under oath to the OTS. And in 2015, Metaxas pled guilty to the conspiracy charge, and was sentenced to 18 months in prison.

This lawsuit followed.

**The Proceedings Below**

*Gateway's Lawsuit*

In July 2015, Gateway filed a complaint against Metaxas. It alleged eight causes of action, for fraud, breach of fiduciary duty, and negligence based on the two transactions with Ideal Mortgage Brokers.

In September, Metaxas filed an answer and in November, a cross-complaint, which she would come to dismiss in February 2016.

At a November 2015 case management conference, the case was set for jury trial for September 2016. Due to various motions, and stipulations, and numerous contested and uncontested matters held before several different

3

judicial officers, trial was continued several times, ultimately to be heard as a court trial in March 2019.

The parties wanted the trial to be before the Honorable Robert Baines, a retired superior court judge. And in October 2018, the superior court filed an order pursuant to Code of Civil Procedure section 638 appointing retired Judge Baines to serve as referee, to hear and determine all issues of fact and law and to report a statement of decision. As the referee would later put it, at the parties' request he was to decide five causes of action, three involving the working capital loan (the first, for fraud; the second, for concealment; and the fourth, for breach of fiduciary duty), and two involving the wire transfer (the fifth, for breach of fiduciary duty; and the sixth, for negligence).[1]

### *The Trial and the Statement of Decision*

Trial began on March 11, 2019, and took place over eight days, with the referee hearing from eight witnesses, five on behalf of Gateway and three on behalf of Metaxas. The five Gateway witnesses were Metaxas; James Keefe, a former Gateway director; Timothy Green, former Gateway chief financial officer (CFO); Grant Stifel, an expert on legal fees; and Brian Kelley, an expert on banking. The three Metaxas witnesses were herself; Joseph Anastasi, an expert on accounting; and James Wagstaffe, an expert on legal fees. The parties introduced 202 exhibits.

Following trial, the parties entered into a "Stipulation and Order Modifying the Order Appointing Referee" to address various posttrial procedures, including the schedule for submitting posttrial briefs and the timing and procedure for rendering the statement of decision. And the parties requested a statement of decision on whether Metaxas was liable to Gateway on its various causes of action; the amount of damages; whether

---

[1] In October 2017, Gateway had dismissed some causes of action.

4

Gateway's claims were barred by various affirmative defenses; and whether Metaxas was liable to Gateway for attorney fees and costs.[2]

On May 17, both sides filed lengthy posttrial briefs, to which each side filed replies.

On July 3, the referee served his proposed statement of decision, indicating his intent to rule for Gateway and to award tort of another damages for its legal costs in defending itself and its Board members, and damages in connection with the wire transfer.

The last day to file objections to the proposed statement of decision was July 17. No objections were filed by Metaxas. However, on July 29, Metaxas filed a nine-page brief constituting her objections to the proposed statement, arguing that California's "special benefit" doctrine required the referee to offset Gateway's purported gains against its tort of another losses. Gateway agreed to allow the referee to consider Metaxas's belated objections.

On August 5, the referee filed an amended statement of decision, a comprehensive 28-page decision, whose substance begins with eight pages of "facts" pertinent to the two transactions in issue. Metaxas spends many pages in her brief focusing on her lengthy experience at the bank, and various claimed successes. And as to the referee's facts, Metaxas's brief asserts there were "conflicts" or "competing" evidence. She also accuses an expert witness for the bank of "guessing" and "surmise." This, of course, is improper, as it disregards a fundamental rule of appellate review, that we view the facts

---

[2] The parties also: waived the issuance of a tentative decision under California Rules of Court (CRC), rule 3.1590(a)–(c); were deemed to have requested a proposed statement of decision and judgment under CRC 3.1590(d)–(f); and agreed to follow the procedures set forth in CRC 3.1590(g) and (h) regarding objections to the proposed statement of decision and judgment.

favorably to the judgment (*David v. Hernandez* (2014) 226 Cal.App.4th 578, 581), under the principle requiring us to presume the lower court's judgment is correct, and drawing all inferences and presumptions necessary to support it. (*Chapala Management Corp. v. Stanton* (2010) 186 Cal.App.4th 1532, 1535, citing *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.)

Thus, and because we can hardly improve on the referee's excellent exposition of the facts, we quote liberally from his statement of decision (deleting all citations), adding our embellishments where appropriate. And we begin with the facts after the OTS rated Gateway as a "troubled institution":

"The Gateway Board and Metaxas knew the OTS rating and the proposed cease and desist order could spell disaster for the bank. As the Board noted at its February 26, 2009 meeting, '[t]he Capital infusion, accompanied by a meaningful reduction of the Bank's NPAs will also result in the removal of the troubled designation, something the management and the Board consider key and critical to the institution's soundness and success.' The Board set a deadline, March 31, 2009, to turn matters around.

"To raise capital, the Board authorized the issuance of a round of preferred shares. All Board members and bank executives were encouraged to find buyers, including themselves. The Board also requested that all attempt to find buyers for the troubled assets.

"For a number of years, Gateway had enjoyed a very close working relationship with Ideal Mortgage Bankers, Ltd., of New York, d/b/a Lend America ('Ideal'). Gateway was the warehouse lender for Ideal's mortgage loans; it had granted Ideal a $100,000,000 warehouse loan 'facility' or line of credit. Gateway was also the main purchaser of the loans made by Ideal. In essence, Gateway provided the funds for Ideal's mortgages, then bought those

6

mortgages and resold them on the secondary market to 'takeout lenders,' making a profit at each stage. Ideal was Gateway's largest and most profitable customer.

"Upon receiving the February 5, 2009 downgrading from OTS, the Board instructed Metaxas to approach Ideal for possible assistance. Accordingly, Metaxas and Michael Kenny, Gateway's Senior Vice President ('Kenny') flew to New York on February 12, 2009. They met with Michael Ashley, who held various titles at Ideal, including those of Executive Vice President and Chief Business Strategist[fn.] ('Ashley') and Helene DeCecillis, Ideal's Chief Operating Officer." The footnote stated that "Ashley's various titles at Ideal were not entirely clear. Ashley had previously been convicted of wire fraud in the mortgage business and, as a result, was precluded from holding certain positions at financial institutions."

"Ideal obviously had a vested interest in the survival of its warehouse lender, and was more than willing to assist. Ideal offered to help locate buyers for Gateway's troubled assets,[fn.] and for its preferred shares. Immediately following the February 12 meeting, Metaxas happily reported these developments to Board members." The footnote stated that "The assets in question were 25 REOs with a 'book value' of $7,993,368 and 27 NPLs with a 'book value' of $7,278,180."

"Ashley found buyers for $6.9 million of shares, and suggested possible purchasers for Gateway's troubled assets. In addition, he put together his own group of asset buyers, comprised of three New York companies: Cooper Capital Group, Ltd. ('Cooper'), Empower International, Inc. ('Empower'), and the Steve Menna Group ('Menna'). These three entities were closely tied to Ashley; Ashley owned Cooper, his father owned Empower, and the owner of Menna Group was affiliated with Ashley." In March 2009, Metaxas learned

7

that Ashley, owner of Cooper, along with his father Kenneth, owner of Empower, had been convicted of federal wire fraud in connection with illegal mortgage activity. The credit memoranda failed to mention those convictions, and Metaxas did not inform the Board of these facts.[3]

"By March 11, less than 30 days after the New York meeting, Metaxas announced to the OTS that Gateway had an asset sale in place. She eagerly reported that, although 'not fully consummated yet,' 'we have now secured agreement' and she expected to complete the logistics of the sale the following week ('the purchasers of these assets are expected in our offices Tuesday—Wednesday of next week'), and she expected to close the sale by March 25th, the day before the next Board meeting. Metaxas also reported to the OTS that the purchase price represented over 95 percent of book value of the troubled assets. It was clear from our evidence that Metaxas was referring to the three buyers assembled by Ashley.

"Although Metaxas had announced on March 11th that an asset sale was close at hand, it appeared that this deal may have been somewhat of a 'fallback' deal, to be used in the event other buyers could not be found. Indeed, Gateway continued to look for other possible buyers. One potential buyer was Waterfall Capital ('Waterfall'). On March 17th, Waterfall made a $5,000,000 offer for the troubled assets. Gateway declined the offer, as the Bank had determined its bottom line was $8,000,000. When Ashley was informed that Waterfall's purchase would not occur, he indicated that 'It's my headache,' and that he would still be meeting with other potential buyers. Not long afterwards, the initial three buyers (Cooper, Empower, and Menna)

---

[3] At trial, Metaxas tried to justify the nondisclosure by claiming it "was not a matter that would have any bearing on the Board's decision approving or declining the loan."

travelled to Gateway Bank in California to finalize the deal. Metaxas testified that the meeting took place and that despite her March 11th communication to the OTS regarding the meeting, the OTS did not send a representative to that meeting.

"The deal with the three buyers was that each would purchase a share of the 25 REO properties and each would purchase some of the 27 NPLs, for a combined purchase price of $15,271,548. Under the terms of that sale, the three buyers would each make a twenty-five percent down payment (for a total down of $3,817,887) and each would then borrow the balance of the purchase money (totaling approximately $11.2 million) from Gateway under a 'loan to facilitate.' To secure these loans, Gateway was to retain a security interest in the transferred assets.

"The deal with the three buyers was soon finalized and then scheduled for consideration by Gateway's Executive Loan Committee ('ELC') and its full Board on March 26. If approved, the sales were to close by March 31.

"Also on the agenda for March 26, at both the ELC and Board meetings, was approval of a large ($3.65 million) 'working capital' loan to Ideal. According to Metaxas, Ideal had requested this loan earlier in 2009, and it had been discussed at the February 12th meeting in New York.

"Metaxas helped present both matters to the ELC and the Board on March 26. When doing so, she did not tell the Board of any connection between the two agenda items, or that Ideal had procured these three buyers. She testified that on March 26, she was aware that Ideal owed money to Cooper, and suspected that some of the working capital loan might be used to pay down that debt; however, she did not share her suspicion with the ELC or her Board.

9

"The ELC and the Board were quite excited about the asset sale. One Board member remarked, rather prophetically, that it was 'too good to be true.' After all, the Bank was selling its troubled assets for nearly twice the amount of its $8 million bottom line, and was receiving a substantial (twenty-five percent) down payment, with the assets remaining pledged as security for the loans.

"Although the Gateway Board was advised that the three buyers were not well-funded and thus would need to borrow their down payments, the Board found the sale very attractive, and approved it. When discussing how the buyers might obtain their down payment loans, Board member Baxter apparently quipped that he didn't care where they got their down payment as long as it was from a lawful source (i.e., 'not from drug dealers or Al-Queda'). There was no discussion that the down payments might actually be coming from Gateway, via the working capital loan to Ideal.

"At those same meetings, the ELC and the Board approved the 'working capital' loan to Ideal for $3.65 million. The Board was unaware of any connection between the two transactions.

"Soon after obtaining the Board's approval, Metaxas happily reported to the OTS on this sale of the troubled assets, hoping to start the process for receiving a better rating and avoiding the proposed cease and desist order.

"However, her hopes were soon dashed; less than a week later, the OTS made an inquiry about the March 26 transactions, asking for more details. The OTS clearly was concerned about this deal in which buyers had paid nearly full book value for troubled assets. The OTS asked about any possible connections between Gateway and the buyers or entities affiliated with the buyers. It also asked for the documentation on the loan to Ideal. Metaxas responded that there were no relevant connections between Gateway and the

10

asset buyers or their affiliates. She did not reveal that Ashley of Ideal had procured the three buyers and that he was closely involved with the three buyers."

On March 30, Ideal withdrew from Gateway the full proceeds of the $3.6 million working capital loan, which was unusual, as most such loans are revolving lines of credit to be drawn down as funds are needed, not funded on the very first day. Ideal transferred the funds to Cooper, Empower, and Menna, and the next day, the three of them made down payments equal to 25 percent of the purchase price of the toxic assets, i.e., $3.8 million. Thus, the proceeds from the working capital loan made what came to be called at trial a "round trip" to Gateway, disguised as part of the down payments for the toxic assets.

On March 31, Metaxas sent this email to the Board celebrating her accomplishment in organizing the transactions: "Dear Directors: Just a quick note to confirm that we manged [*sic*] to complete the three bulk sales of REOs and NPAs that we discussing [*sic*] at our last Board meeting. . . . With our capital fully raised and our NPAs reduced so significantly, now we all have good reason to be proud of our Bank and celebrate our blessings."

Metaxas's celebration was short lived.

George Lim, the OTS field examiner assigned to Gateway, questioned the asset sale, and on April 6, asked Metaxas whether those sales were in any way connected to the working capital loan. Metaxas denied any connection between the transactions, and on April 8, wrote to Lim's boss that the sale prices were real, that there were no connections between Gateway and the asset buyers or their affiliates. This is how she put it: "Responding to Mr. Lim's inquiry, I hereby wish to certify . . . there are no existing and/or proposed business or other relationships between the purchasers (including

11

the respective companies' owners and affiliated entities) and Gateway and its directors, senior officers, and principal shareholders."

What Metaxas did not reveal was: that Ashley, whom she knew to be the owner of one of the buyers, Cooper, also ran Gateway's largest customer and mortgage partner, Ideal; that Ashley's father Kenneth owned one of the buyers, Empower; that the owner of the third buyer, Menna, was closely affiliated with Ashley; and that Ashley had procured the three buyers at Gateway's request.

"At the same time the OTS was scrutinizing Gateway's actions, other federal agencies were investigating Ideal's lending practices. On October 20, 2009, the United States Attorney's office filed a civil suit against Ideal, alleging fraudulent loan origination practices and seeking to enjoin Ideal from making any further FHA-insured loans. The suit alleged that Ideal had falsified loan applications to make borrowers appear eligible for FHA-insured loans.

"When informed of the complaint against Ideal, Metaxas issued a strong directive to all Gateway employees that same day, October 20, 2009. It basically ordered Gateway to cease dealings with Ideal.[4]

"The next day, October 21st, Metaxas testified before the OTS regarding Gateway's March 26th transactions. She testified, under oath, that the troubled asset sale was an 'arms-length' transaction, that there was no connection between Gateway and the three buyers, and that she didn't know the source of the buyers' down payments."[5]

---

[4] Metaxas's directive commanded her staff to "**Stop funding requests** until proof has been provided that the matter with HUD and/or the U.S. Attorney's office is resolved satisfactorily."

[5] Metaxas's testimony included this question and her answer:

On November 27, and over the objections of Gateway CFO Green, Metaxas personally directed Gateway's wire room to transfer $757,000 from Ideal's account at Gateway to Ideal's payroll account at another bank—this, at a time when Ideal was not only in litigation with the government for civil fraud, but also owed Gateway approximately $55 to $60 million. In short, Metaxas overruled the Gateway CFO and personally directed the $757,000 wire transfer to Ideal, a company on the verge of collapse.

And collapse it did, as on the next business day, November 30, the government revoked Ideal's license to make mortgage loans. Ideal shut down and went out of business.

Thus, and in disregard of her own directive, Metaxas caused Gateway to buy a portfolio of mortgages from Ideal that, due to fraudulent practices at Ideal, included worthless mortgages, which came to be referred to at trial as "air loans."

On December 30, Metaxas sent an email to the Board that Ideal had closed its business, that Gateway had been unable to perfect its security interest in Ideal's Ginnie Mae mortgage servicing rights, and that the entire working capital loan balance of $3.65 million would be written off no later than December 31. This, Metaxas claimed, was the amount of Gateway's loss.

---

"Q. The agreement to purchase the REO required 25 percent down payment. Do you know where that 25 percent source of funds for that 25 percent down payment from the Steve Menna Group came from?

"A. No sir. One of the things that is demonstrated very clearly by looking at—at each one of the underwritings, say, perhaps, for the Cooper Group, is that our underwriting was significantly more gratuitous than it would have been for a regular loan, a regular commercial loan that we would have made in accordance with our—our—with our bank standards. So one of the things that we did not do is verify source of down payment."

13

On January 4, 2010, Gateway sent Ideal a notice of default accelerating the working capital loan and demanding repayment of the unpaid balance. The loan was never repaid.

Meanwhile, the OTS investigation continued, to Metaxas's chagrin. On January 14, Metaxas sent a letter to OTS senior management complaining about Lim. The letter insisted Lim be removed from the Gateway investigation, and be replaced with another examiner, in Metaxas's words, "to resolve the painful and unnecessary difficulties caused by [his] behavior," and "to ensure the elimination of poisonous interference that has now become intensely personal."[6]

In March 2010, the OTS contacted Larry Wang, chairman of the Gateway Board, and directed him to call a meeting of the Board without Metaxas being present. At this meeting the OTS provided evidence that Metaxas had engaged in fraudulent transactions with Ideal and demanded that she be removed from the bank. And in May 2010, Metaxas left the Bank.[7]

"In 2010, it was determined that some of the loans purchased by Metaxas from Ideal on November 27, 2009, were bogus 'air loans,' i.e., Ideal had not paid off the original lender despite receiving the funds to do so.

---

[6] Among other things, Metaxas's letter objected to Lim's questioning the veracity of the Board minutes from the March 20, 2009 meeting; to his inquiry into a loan "made to several entities to facilitate the sale of REO"; and to his concern "with the valuation of the loans included in [the toxic asset sale] and the subsequent selling price," including his belief that "the assets were sold well above fair market value and therefore the transaction made no sense."

[7] Metaxas's brief says that the "Board permitted Metaxas to resign in the midst of her battle with cancer."

14

FNMA, which purchased these mortgages from Gateway, required Gateway to repurchase the bad loans; Gateway did in April 2010.

"In February 2011, a federal criminal Grand Jury issued a subpoena to Gateway, requiring documents and testimony. The Grand Jury apparently was looking into a variety of alleged wrongdoings by Ideal, Gateway, and possibly others. At that stage, it was unclear exactly what wrongdoings were being investigated, and who were the targets of the investigation. The Bank's response to this criminal investigation was to fully cooperate and attempt to convince the Grand Jury that Gateway may have been a victim of a crime, but was not a perpetrator. The investigation, and the subpoenas, continued for the next three years.

"Ideal had been forced into bankruptcy in 2010. In late 2012, the bankruptcy Trustee commenced adversary proceedings against Gateway, seeking to recover $50 million because of Gateway's alleged failure to honor funding commitments it had made to Ideal. After defending against the Trustee's action for almost two years, Gateway settled for $225,000 in September of 2014."

Meanwhile, the United States Attorney for the Eastern District of New York began investigating Gateway as part of its ongoing investigation of Ideal. In connection with this investigation, Gateway received four grand jury subpoenas between 2011 and 2014, causing Gateway to hire criminal defense counsel to defend itself and respond to the subpoenas. Doing so, Gateway's counsel reviewed some 12,000 emails for privilege and relevance; produced over 40,000 pages of documents and emails; interviewed over 25 bank officers, directors, and employees; conducted an internal investigation of Gateway; and prepared 22 bank employees to be interviewed by prosecutors.

15

The result of all this was that Gateway incurred millions of dollars in legal fees.

In March 2014, Metaxas was indicted on three counts: (1) conspiracy to commit bank fraud in connection with the round trip transaction; (2) bank fraud in connection with this transaction; and (3) perjury, lying under oath to the OTS when she claimed she did not know the source of the down payments for the toxic asset sale.

In April 2015, Metaxas pled guilty to conspiracy to commit bank fraud. Doing so, she acknowledged under oath in open court that she intentionally concealed from the Board the true facts about the round trip transaction. As Metaxas's own brief describes it, "[h]er plea included an admission that she knew in advance that the working capital loan and the troubled asset sale were connected but did not communicate that to the Gateway Board."[8]

---

[8] The relevant colloquy, some of which was quoted by the referee, included this:

"THE COURT: Ms. Metaxas, at this point I need you to tell me in your own words what you did that makes you guilty of Count One. . . .

"THE DEFENDANT: From 1996 until approximately March of 2010 I was the president and CEO of Gateway Bank, a federally chartered savings bank in California. In 2009, I acted and agreed with others to arrange certain transactions that would help make Gateway's books look more acceptable to the regulators. One set of transactions included a loan to Gateway's biggest customer which in [*sic*] your Honor it was used to fund payments back to the bank in the form of down payments from three other entities that purchased certain assets that the regulators wanted off the bank's books.

"I knew that the customers used the money from the loan to fund the down payment to Gateway for the purchase of the assets.

"Taken together, these transactions did not actually improve the condition of the bank, and I did not provide the complete information about these transactions to Gateway's Board which ultimately had to approve them. [¶] . . . [¶]

16

At her sentencing hearing, Metaxas also apologized for her failure to disclose the source of the down payment for the toxic assets, telling the court, "It was wrong of me not to share the information that I had with the Board, and for that I am truly very sorry," "I know I will be haunted by this non-disclosure until the day I die," and "I wonder how I will ever be able to forgive myself." And, she added, "I am determined to make things right to the best of my ability. I understand that this court will order me to pay restitution. I welcome that. I want to do my best to make amends with Gateway."

---

"THE COURT: When you agreed with others to commit, to be involved in this fraudulent scheme, did you do so knowingly and intentionally?

"THE DEFENDANT: Yes.

"THE COURT: And you knew it was against the law to commit a fraudulent scheme like this, didn't you?

"THE DEFENDANT: Yes. [¶] . . . [¶]

"THE COURT: All right. Ms. Metaxas, please stand. How do you now plead to Count One of the indictment 14-109, conspiracy to commit bank fraud, guilty or not guilty?

"THE DEFENDANT: Guilty.

"THE COURT: Did you do what you are charged with doing in Count One, Ms. Metaxas?

"THE DEFENDANT: I did.

"THE COURT: Are you pleading guilty because you are guilty?

"THE DEFENDANT: Yes.

"THE COURT: Are you pleading guilty voluntarily and of your own free will?

"THE DEFENDANT: Yes."

As the referee described, "Metaxas was sentenced on December 2, 2015. She served her 18-month sentence, but currently is challenging her conviction, alleging that she received erroneous legal advice from her counsel, which advice caused her to enter a guilty plea."

17

Following his exhaustive recitation of facts, and a discussion of the parties' contentions, the referee's statement of decision turned to his analysis of liability, beginning with that for the working capital loan. After a brief description of the issue, the referee described the essence of it: "The crucial legal questions regarding Metaxas's liability for the March 26 transactions are: (1) did she know the 'actual deal' when she presented those matters to the Board; (2) if so, did she intentionally not reveal that knowledge; if so, (3) did she intend to deceive her Board into thinking these were legitimate and unrelated transactions that the Board ought to approve; if so, (4) did the Board reasonably rely on her representations and omissions when approving these two transactions, and, finally, if so, (5) was the Bank damaged as a result of entering into those transactions." And, the referee said, he "is satisfied that the answer to all of these questions is 'yes.' "

The referee then spent over four pages explaining in detail the reasons for his "yes" response, concluding as follows: "The Bank clearly changed its position (i.e., it entered into the March 26 transactions) in reasonable reliance on Metaxas's representations and omissions, and did so to its detriment. . . . As such, the Bank has proven, by a preponderance of the evidence, all the essential elements of the First Cause of Action (fraud), Second Cause of Action (fraudulent omission/non-disclosure), and the Fourth Cause of Action (intentional breach of fiduciary duty) with regard to the March 26 transactions. Given this finding that Metaxas's actions were intentional, the question of whether she might have been negligent in those matters (as alleged in the Sixth Cause of Action) is moot."

The referee then turned to Metaxas's liability for the $757,000 wire transfer. And following a four-paragraph analysis, he concluded Metaxas was liable because she breached her fiduciary duty.

18

The referee then discussed for some eight pages the issue of damages, at the conclusion of which he awarded Gateway damages totaling $382,154, $250,000 of which was tort of another damages.[9]  As he described, Gateway "clearly was damaged by the 'fallout' from being induced to enter into the March 26 transactions," going on to decide that "some portion" of the almost $1,500,000 in attorney fees defending the criminal investigations was appropriate, concluding as follows:  "Metaxas's tortious conduct on March 26th clearly caused the bank to hire counsel to defend itself, and its Board members, in the Grand Jury investigations.  The undersigned's best approximation of the amount of fees reasonably incurred by the Kilpatrick & Townsend firm for work related to the events of March 26, 2009, is $250,000.00, and that amount is awarded."  The referee also awarded

---

[9] The tort of another doctrine, sometimes called the third-party tort doctrine, provides that a party may be awarded attorney fees in a situation where one person commits a wrongful act that he or she can reasonably foresee would cause another to have to defend or prosecute a lawsuit involving a third party.  As the Supreme Court has described it:  "A person who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover compensation for the reasonably necessary loss of time, attorney's fees, and other expenditures thereby suffered or incurred." (*Prentice v. North American Title Guaranty Corp.* (1963) 59 Cal.2d 618, 620.)

The doctrine is not an exception to the rule that parties bear their own attorney fees, "but an application of the usual measure of tort damages.  The theory of recovery is that the attorney fees are recoverable as damages resulting from a tort in the same way that medical fees would be part of the damages in a personal injury action.  In such cases there is no recovery of attorney fees qua attorney fees. . . .  [¶]  [N]early all of the cases which have applied the doctrine involve a clear violation of a traditional tort duty between the tortfeasor who is required to pay the attorney fees and the person seeking compensation for those fees." (*Sooy v. Peter* (1990) 220 Cal.App.3d 1305, 1310.)

Gateway $132,154 for the breach of fiduciary duty in connection with the wire transfer.

Following all that, the referee turned to Metaxas's claim of "special benefit," rejecting it with this analysis: "As for Metaxas's argument that the above damages (both for the March 26 transactions and the November 27 transfer) should be offset by the 'special benefit' her tortious conduct conferred on the Bank (by way of the amounts it realized when all three asset purchasers as well as Ideal defaulted on their loans), the cases make it clear that this offset is an equitable process, to be applied in the discretion of the fact finder: '. . . consideration *may* be given, *where equitable*, to the value of any special benefit conferred by that act . . . .' (*Maben v. Rankin* (1961) 55 Cal.2d 139, 144 (italics added)); '. . . the value of the benefit conferred is considered in mitigation of damages, *to the extent that this is equitable.*' (*Turpin v. Sortini* (1982) 31 Cal.3d 220, 236 (italics added).) Metaxas's conduct overall in these matters, including the harm to the Bank's overall business reputation, dictates against the exercise of equitable discretion in her favor."

### *The Motion to Vacate*

The amended statement of decision was filed on July 26, and judgment entered that same day. On August 13, Metaxas filed a motion to vacate judgment, arguing that the referee had no authority to exercise equitable discretion in his application of the special benefit doctrine. The Bank filed opposition, Metaxas a reply, and the motion came on for hearing on October 11. On October 14, the referee filed his order denying the motion in two thoughtful paragraphs. The first paragraph distilled the law. The second said this:

20

"2.  The Equities in This Case Did not Favor Defendant Metaxas: Because her only argument on this motion was that application of the Special Benefit Doctrine could not include equitable considerations, she did not address whether the undersigned was wrong in the equity determination he made.  However, even if she had challenged the equity determination, the undersigned stands by his earlier conclusions as to where the equities lay.  Defendant Metaxas's intentional tortious conduct caused the Bank years of unnecessary legal battles with federal regulators and federal criminal prosecutors, not to mention the reputational harm that obviously flowed from having its former President and CEO charged with bank fraud.  Even if the phony round-trip transactions she induced resulted in some financial gain to the Bank, that gain was clearly outweighed by the years of troubles her actions caused the Bank, financial and otherwise."

On October 29, Metaxas appealed.

## DISCUSSION

### The Referee's Award of $250,000 Tort of Another Damages is Supported by the Record

As noted, Metaxas makes two arguments on appeal, the first of which is that "because Gateway profited overall from the round trip transaction, the trial court erred in awarding Gateway compensatory damages for that transaction."  Metaxas contends Gateway benefited pecuniarily from the transaction, and thus under the "special benefit" doctrine, the referee could not award any damages.  Or, to put it in the words of Metaxas's sub-argument, the referee "lacked discretion to award compensatory damages without taking into account the profits Gateway earned from the round trip transaction."

Metaxas is wrong for several reasons, beginning with the law of special benefit.

21

The special benefit doctrine is based on section 920 of the Restatement Second of Torts (section 920). Section 920 is entitled "Benefit to Plaintiff Resulting From Defendant's Tort," and provides in its entirety as follows: "When the defendant's tortious conduct has caused harm to the plaintiff or his property, and in so doing has conferred a special benefit to the interest of the plaintiff that was harmed, the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable."

Metaxas argues that the referee had "no discretion to disregard Gateway's profits." In the words of Metaxas's brief, the reference to "equitable" in section 920 "merely provides courts with flexibility in the unusual case where deducting benefits does not place the injured person in the position they would have occupied absent the tort. (Rest.2d Torts, §920, com. f.) That exceptional circumstance occurs when the tort causes a 'benefit' the injured party never wanted:

"f. Equitable considerations. The rule stated in this section *is limited by the general principle underlying the assessment of damages in tort cases*, which is that an injured person is entitled to be placed as nearly as possible in the position he would have occupied had it not been for the plaintiff's tort. This principle is intended primarily to restrict the injured person's recovery to the harm that he actually incurred and *not to permit the tortfeasor to force a benefit on him against his will*."

In other words, Metaxas reads comment f. to mean that a court may exercise its equitable discretion *only* in the "exceptional circumstance" where a "non-cash benefit" is foisted upon an unwilling plaintiff, when the tort caused a "benefit" the injured party never wanted. And, Metaxas asserts,

22

where "cash outflows and inflows" are concerned, "both the law and equity require the deduction of benefits."[10]

To begin with, Gateway did not ask for any purported "benefit." As the referee found, the evidence showed that the Board would not have approved either the toxic asset sale or the working capital loan if Metaxas had disclosed the true facts. So, any benefit Gateway obtained as a result of Metaxas's fraud were obtained against the Board's will, a "benefit" the bank never wanted. Thus, even under Metaxas's own view of the law, she would not be entitled to an offset.

In any event, Metaxas cites no case supporting her contention. And her argument ignores the last seven words of section 920, essentially arguing that the plain language of section 920 does not mean what it says.

While comment f. endorses the basic tort principle that meritorious plaintiffs should be placed in the position they would have occupied had it not been for defendant's wrongdoing, it does not compel a court to disregard equitable considerations when assessing damages. To the contrary, any decision to mitigate damages is only "to the extent that it is equitable."

---

[10] We are constrained to note that Metaxas's citation to comment f. is less than candid, as it omits the language that follows her quotation, which is this: "Thus, when a person has land or chattels that he has devoted to a particular purpose, he is entitled to continue to use them for that purpose, and the person who interferes with the use is not entitled to have damages mitigated by the fact that he has added to their market value. In these cases the good faith, and reasonableness of the attitudes, of the parties are factors in determining the measure of recovery. Thus unless the plaintiff is capricious or spiteful and the defendant has acted by mistake, so that his conduct was not knowingly tortious . . . , the damages may not be diminished by the fact that the defendant's interference has increased the monetary value of the property. On the contrary, if the owner has acted reasonably in restoring the property to its original condition, he may recover the cost of doing so."

The referee noted this has been the rule in California since at least 1961. As indeed it has, as expressly set forth in the cases that discuss the special benefit doctrine, including cases cited by Metaxas. The following are illustrative:

*Maben v. Rankin* (1961) 55 Cal.2d 139, 144: "[C]onsideration may be given, where equitable, to the value of any special benefit conferred by that act to the interest which was harmed."

*Turpin v. Sortini* (1982) 31 Cal.3d 220, 236: " 'the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable.' "

*Heckert v. MacDonald* (1989) 208 Cal.App.3d 832, 839: " 'the value of the benefit conferred is considered in mitigation of damages, to the extent that this is equitable.' "

*Heckert v. MacDonald, supra*, 208 Cal.App.3d 832, a decision of this court, is instructive. There, the buyer of an apartment building sued the sellers and their broker for structural defects the broker failed to disclose; the sellers cross-complained against the broker for their attorney fees. The trial court held that the sellers were entitled to recover their attorney fees under the tort of another doctrine, but that the fees should be mitigated because the sellers benefited from the broker's conduct by realizing an inflated profit from the sale. We affirmed, expressly noting the "incestuous relationship" between the sellers and their broker, thus concluding the lower court's decision was "*equitable in the circumstances of this case.*" (*Id.* at p. 840, italics added.) So, far from requiring an automatic deduction where "cash profits" are concerned, as Metaxas contends, *Heckert* reinforces the rule that the value of the benefit conferred is considered in mitigation of damages "to the extent that this is equitable."

24

In short, the rule is 180 degrees from that of what Metaxas asserts: the equitable nature of the special benefit doctrine means that the value of the benefit *may* be considered. Or, as Witkin succinctly states it, mitigation under the special benefit doctrine is "sometimes" appropriate: "If the defendant's tort causes injury to the plaintiff, but also confers a special benefit on the plaintiff, the value of the benefit may sometimes be considered and the plaintiff's recovery limited to the net loss. (*Maben v. Rankin* (1961) 55 Cal.2d 139, 144 ['In determining the damages suffered as a result of a tortious act, consideration may be given, where equitable, to the value of any special benefit conferred by that act to the interest which was harmed']; Rest.2d, Torts § 920; see *Dakota Gardens Apartment Investors "B" v. Pudwill* (1977) 75 Cal.App.3d 346, 352, 354, citing the text [defendant cannot diminish amount of damages by paying debt of plaintiff without plaintiff's consent; mitigation will be denied where it is inequitable]; 22 Am.Jur.2d (2013 ed.). [Citations.])" (6 Witkin, Summary of Cal. Law (11 ed. 2021) Torts, §1803.) "Mitigation of damages in tort cases is restricted by principles of equity." (*Dakota Gardens Apartment Investors "B" v. Pudwill*, *supra*, 75 Cal.App.3d at p. 352.)

In light of the equitable nature of the analysis, the observation by our colleagues in Division Four is apt, this in *Richardson v. Franc* (2015) 233 Cal.App.4th 744, 751: "After the trial court has exercised its equitable powers, the appellate court reviews the judgment under the abuse of discretion standard. [Citation.] 'Under that standard, we resolve all evidentiary conflicts in favor of the judgment and determine whether the trial court's decision " 'falls within the permissible range of options set by the legal criteria.' " ' " (Accord, *Hirschfield v. Schwartz* (2001) 91 Cal.App.4th 749, 771.) And to demonstrate such abuse, Metaxas must show that the referee's

25

decision " 'is so irrational or arbitrary that no reasonable person could agree with it.' " (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773.)  This, she has not done.

As quoted above, the referee held in the statement of decision that "Metaxas's conduct overall in these matters, including the harm to the bank's overall business reputation, dictates against the exercise of equitable discretion in her favor."  And as the referee later put it in his order denying the motion to vacate, Metaxas's "intentional tortious conduct caused the bank years of unnecessary legal battles with federal regulators and federal criminal prosecutors, not to mention the reputational harm that obviously flowed from having its former President and CEO charged with bank fraud.  Even if the phony round-trip transactions she induced resulted in some financial gain to the bank, that gain was clearly outweighed by the years of troubles her actions caused the bank, financial and otherwise."  The referee's conclusions are fully supported.  They are equitable.  And they are correct.

We note that Metaxas makes no attempt to show that the equities favored her, thus running afoul of the most fundamental principle of appellate review:  " 'A judgment or order of the lower court is presumed correct.  All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.)

Were that principle not dispositive, Metaxas's argument fails because it has no merit.  Metaxas's entire argument is that the referee's reasons for ruling for Gateway were "unreasonable," assertedly on two grounds:  (1) it was unreasonable for the referee to rely on the nature of her "intentional tortious conduct," which "is relevant only in the punitive damages context," and (2) it was unreasonable for the referee to rely on the harm she caused,

26

because the referee "unreasonably double-counted some harm and relied on other harm that was unproven."

To begin with, Metaxas cites nothing in support of her claim that her "intentional tortious misconduct" is "relevant only in the punitive damages context."[11]  But beyond that, the referee could properly rely on Metaxas's conduct—more accurately, misconduct—to exercise his equitable discretion against her.

Metaxas's "intentionally tortious misconduct" withheld the true information from the Board, to deceive the Board into thinking the transactions were such that the Board ought to approve them—a fact, not incidentally, she expressly admitted when she entered her guilty plea.

Metaxas's "intentionally tortious conduct" included lying to the OTS about her knowledge and involvement in the fraudulent transactions. Indeed, Metaxas, who knew the OTS was investigating the legitimacy of the March transactions, including the source of the down payments, point blank told the investigators there were no connections among the purchasers and she did not know the source of the down payments.

Metaxas also obstructed the OTS's investigation.  But not only did Metaxas obstruct, she personally attacked OTS examiner Lim and demanded he be fired, causing more problems for Gateway.  Banking expert Kelley, who had personally dealt with regulators in this situation, testified that a CEO is the face of the bank to the regulators, and should foster an open and

---

[11] Metaxas overstates the effect of the referee's refusal to award punitive damages.  That is, she asserts that the referee "reasoned that Metaxas's conduct leading to the round trip transaction was not particularly egregious."  The referee made no such ruling.  Rather, he declined to award punitive damages because Metaxas had already received and served an 18-month prison term for her wrongful actions, and that "further punishment, by way of punitive damages, does not appear necessary at this juncture."

27

cooperative relationship with them. By excoriating Mr. Lim for investigating the very transactions Metaxas later admitted were fraudulent, she "almost openly declared war on the OTS"; it was a "death sentence" to the relationship.[12]

As noted, the referee expressly concluded that Metaxas's actions damaged Gateway's reputation. As it did. Again, expert Kelley's testimony is apt: "[W]hen the federal government issues a press release and says that your former president is accused of fraud and has been sentenced to a jail sentence, that has an impact on the bank's reputation in the community. It

---

[12] This was the relevant testimony from Kelley:

"Q. How would writing a letter like that January 2010 letter that Ms. Metaxas sent concerning . . . Lim affect the compliance costs that the bank would incur going forward?

"A. Oh, I think it would immensely. I think at that point the OTS—when you get to the stage where you absolutely feel that management is not being truthful or cooperative, you know, you take no—you make no exceptions, you demand everything, you assume the bank is lying to you about everything they provide you. Again, it's just a—it's complete lack of trust.

"In my experience, when you have that lack of trust, the outcome is that you all of a sudden now have to have legions of attorneys and accountants that have to support the bank's position, that have to defend the bank to the regulators, that have to be in place to respond to examination questions. It's just a Pandora's box that you open.

"Q. Have you dealt with regulators in that situation?

"A. I have. I've dealt with—again, been engaged by the FDIC to work with them in suing management and directors of failed banks, and unquestionably, that management and directors often times, accuse them of bias or being unfair or not behaving appropriately.

"What I'm telling you is that I haven't seen certainly in my own career ever the need to send out this kind of letter. To me, it would have again been a death sentence on my relationship with the regulators."

has undoubtedly an impact on the bank's marketing efforts, on its ability to hire and retain qualified officers, probably even has an impact on the amount of interest they have to pay for deposits that the bank raises.  Those are significant."[13]

The referee's equitable decision is fully supported here.

---

[13] Kelley's testimony began with this hyperbolic description:  "I think when you're talking about reputational and franchise costs, they are significant.  They are harder to quantify, obviously, but, you know, when your CEO is led off in handcuffs, that has an impact on the bank's perception within their community."  This exchange then occurred:

"[COUNSEL FOR METAXAS]:  Objection, your Honor.  That never happened.  This is just fabricated testimony.

"[THE REFEREE]:  You want to clarify what you mean by 'led off in handcuffs?'

"[KELLEY]:  Yeah.  I was speaking figuratively.  When you're—when the federal government issues a press release and says that your former president is accused of fraud and has been sentenced to a jail sentence, that has an impact on the bank's reputation in the community.  It has undoubtedly an impact on the bank's marketing efforts, on its ability to hire and retain qualified officers, probably even has an impact on the amount of interest they have to pay for deposits that the bank raises.  Those are significant."

Metaxas's counsel moved to strike Kelley's testimony.  The referee denied the motion, noting that, it's "common sense" that the government's accusations and Metaxas's guilty plea would affect Gateway's reputation:  "I don't see any harm in [Kelley] saying you can't quantify it, but obviously those events hurt a bank's image.  It's not rocket science."

Now on appeal, Metaxas first describes Kelley's testimony about harm to reputation as a "guess."  She then goes on to argue that Gateway "forfeited its right to be compensated for reputational harm by not pleading that type of injury," that Kelley's opinion had "no evidentiary value," and that Gateway failed to prove "the extent of such damage."

As Gateway puts it, this is a "red herring."  The referee did not award any damages for reputational harm, and Metaxas's counsel had every opportunity to cross-examine Kelley on his opinion.

29

But even assuming Metaxas's reading of the special benefit doctrine were correct—which it is not—her argument would nevertheless fail for the fundamental reason that the evidence did not undisputedly show a special benefit.

It is probably enough to quote from Metaxas's own opening brief, which has a boldface heading that "Experts Disagree About Whether Gateway Incurred Damages Due To The Round Trip Transaction." Such "disagree[ment]" must be interpreted in favor of the bank.

As to Gateways "profits," Metaxas asserts that the referee "found that Metaxas's presentation to the Board" caused Gateway to receive "$634,000 in payments for the working capital loan and loans to facilitate." The bank's respondent's brief takes issue with this, asserting that, "[w]hat the Referee *actually* said is that Gateway 'retained the asset buyers' $3.8 million down payment; retained (and resold) the troubled assets themselves, retained the interest it received on all the loans, and received a $220,000 discount on certain of Ideal's servicing rights.' [Citation.] While earlier in [his] decision the Referee noted that Metaxas claimed that Gateway received interest payments totaling $469,000 on the Toxic Assets and $165,000 on the working capital loan [citation], the statement of decision does not include a factual finding about the specific amount of interest Gateway received and retained. Nor did Metaxas request a finding on that issue."

Confronted with this, Metaxas's reply brief says that the referee "implicitly found that Gateway received a cash benefit from the round trip transaction that was larger than the $250,000 tort of another damages award." And Metaxas goes on for the next several pages to attempt to support the referee's "implicit" finding.

Metaxas cites nothing to support that one can imply a finding *against* a statement of decision. To the contrary, as we ourselves have put it, " 'Where [a] statement of decision sets forth the factual and legal basis for the decision, any conflict in the evidence or reasonable inferences to be drawn from the [evidence] will be resolved in support of the . . . trial court decision.' " (*In re Marriage of Davenport* (2011) 194 Cal.App.4th 1507, 1531, quoting *In re Marriage of Hoffmeister* (1987) 191 Cal.App.3d 351, 358.) "In support of" the decision. Not "against" it.

At oral argument, counsel for Metaxas referred to one sentence in the referee's 32-page statement of decision, a sentence that reads, "treating the March 26th transactions as a whole, it is clear the bank was not damaged financially by the defendant overall." Being "not damaged" is not saying that Gateway "profited." Indeed, in discussing the March 26 transactions, the referee found that under what he called the "actual deal"—as contrasted to what he called the "Metaxas version"—"the bank's financial condition was not improved."

Another, and independent, basis why Metaxas's argument fails is that it is based on another false premise—that Gateway's only damages were monetary. As Metaxas puts it at one point, "But when a plaintiff's losses and benefits are *merely* cash outflows and inflows—as here—both the law and equity require the deduction of benefits. Because *cash is fungible*, the most accurate way to reverse the impact of the tort is to credit the plaintiff for their losses and debit them for their gains. (See *In re De Lavega's Estate* [(1958)] 50 Cal.2d [480] at pp. 488–489.)"

As quoted above, and as the referee found, Gateway was damaged in ways that went beyond "cash," including, for example, suffering harm to its

31

reputation and "the years of troubles [Metaxas's] actions caused the bank, financial and otherwise."

**The Referee's Finding That Metaxas Breached Her Fiduciary Duty To Gateway by Directing the $757,000 Wire Transfer is Supported by the Record**

The second issue before the referee was Metaxas's liability for the November 2009 wire transfer. The referee found Metaxas liable based on breach of fiduciary duty, with this four-paragraph analysis:

"The timing of the events surrounding Metaxas's approval of payment for a group of Ideal mortgages on November 25, 2009, is highly suspicious; Metaxas describes the timing simply as 'unfortunate.' [Citation.] The federal government had just filed a lawsuit seeking to enjoin all of Ideal's FHA lending because of fraudulent loan practices. As a result of that lawsuit, Metaxas had immediately issued an order within Gateway, stopping all transactions with Ideal. Yet, on Wednesday, November 25, 2009, Metaxas, over the objection of her own CFO, approved the payment for Ideal mortgages, and then on Friday the 27th specifically ordered the transfer of $757,000 to Ideal as part of that purchase. The next working day (Monday, November 30) the authorities shut Ideal down.

"At the time of the order to transfer the $757,000, Metaxas obviously knew of Ideal's dire financial situation resulting from the federal lawsuit. She may also have learned from Ideal, or from other contacts in the banking industry, that a shut-down order was imminent.

"Her November 27 transfer appears to have been more of a return favor to Ideal than a sound business decision. And, this purchase clearly worked to Gateway's detriment, as some of the loans indeed were bogus, causing Gateway to lose money on this purchase.

"There is little doubt that this rushed transfer, under the circumstances present at that time, was a breach of Metaxas's fiduciary duties. As such, the allegations of the Fourth Cause of Action (intentional breach of fiduciary duty) have been established regarding this November 25 to 27, 2009 payment to purchase Ideal loans. Her argument that the Bank was legally obligated to transfer the money to Ideal on November 27 is rejected."

Asserting, however inappropriately, things such as her "personal role in the wire transfer was not suspicious," and the "timing of the wire transfer is not suspect," Metaxas contends the referee erred in finding her liable. Her argument is that "she had to let Ideal withdraw its own money and the wire transfer caused no additional damages"; or, as a sub-argument puts it, "Metaxas had no legal option but to approve Ideal's wire transfer request because the requested funds were Ideal's free and clear."

As noted, the referee "rejected" the argument. So, Metaxas has to demonstrate error. She has not.

Metaxas knew by October 2009 that the federal government had sued Ideal for mortgage fraud and was trying to shut it down. In response, on October 20, Metaxas directed her staff to stop all funding requests from Ideal and place a hold on all its checking and any other accounts, testifying at trial that her instructions were to decline all funding requests until there was "proof" that the government's suit against Ideal was "resolved satisfactorily." Despite that, Metaxas approved the wire transfer on the last business day before Ideal was shut down by the federal government, expressly—and angrily—overruling CFO Green in doing so.

Metaxas argues that she did what she did based on the advice of outside corporate counsel, Barry Hovis. But her testimony on this point was

hardly consistent, and on cross-examination she hedged as to whether Mr. Hovis actually gave her that specific advice. This was the exchange:

"Q. Ms. Metaxas, you testified yesterday that sometime between October 21, 2009 and November 27, 2009, you were advised by attorney Barry Hovis to release the hold on Ideal Mortgage's accounts except to the extent of $757,000?

"A. Sir, attorney's advice was obtained by the Bank in reference to the handling of the total Ideal matter, many different things, some of which were referred to in Mr. Green's memo. That information was then taken to the Board that had a Sunday meeting, as you recall, that provided directions to management as to what was appropriate action there. [¶] . . . [¶]

"Q. Exhibit 52 is your email dated October 20, 2009 to the bank's senior management, its directors, and Mr. Hovis, correct? . . . This is directed to the people indicated on the email, correct? [¶] . . . [¶]

"A. That is correct. That is fair.

"Q. That includes all the Bank's senior management at the time?

"A. Correct.

"Q. And Mr. Hovis?

"A. Correct. . . . [¶] . . . [¶]

"Q. And the day before the OTS meeting, he received Exhibit 52, correct?

"A. Correct. [¶] . . . [¶]

"Q. And your testimony is that Mr. Hovis advised you to modify that direction sometime in between October 20 and November 27 when you sent the wire. Isn't that right?

"A. The recommendation Mr. Hovis made to the Board is—was to be careful in cutting off all fundings, as I had proposed in here, sir. [¶] . . . [¶]

34

"Q. And he advised you to reduce the amount of the hold to $757,000?

"A. He did not say that, sir.

"Q. He didn't say that you needed to honor any funding requests, did he?

"A. Mr. Hovis directed—advised is a better word, that unless the Bank has legal reason to really hold onto all of Ideal's money, the Bank should not do so.

"Q. And he put that advice in writing to you? He sent you an email that says that?

"A. Okay. No. He did not put it in writing, sir."

Moreover, when Metaxas overruled CFO Green and directed the wire transfer herself, she did not tell him that Mr. Hovis had instructed Gateway to honor Ideal's funding request. Not only that, when Green was questioned about the intensity of Metaxas's position, and what reasons she offered to justify her decision, he testified that she talked of "customer loyalty" and "platitudes."

Also suspicious is that Metaxas's action was contrary to her position at trial, where she testified it was not her job to be involved in the day-to-day operations of the bank. Despite that, Metaxas took it upon herself to take the "very rare" step to personally direct the $757,000 wire transfer.[14] Nor did Metaxas explain why Gateway had to make the payment that very day, the

---

[14] Banking expert Kelley described the highly unusual nature of Metaxas's actions this way: "I don't believe in 12 years as president of a community bank that I ever authorized a wire or signed a wire. It is not my function remotely, and I certainly wouldn't have dreamed of doing so over the objections of my CFO. I mean, that is the person within the bank that is really tasked with maintaining financial integrity within the bank in terms of the systems and practices of the bank. So yeah, for her to do that, to me, would be very rare in my experience."

rushed timing of which, the referee noted, was "highly suspicious," coming as it did on the eve of Ideal's collapse.  The referee could, as he did, reasonably infer that the transfer was more of a "return favor to Ideal than a sound business decision."  The referee could, as he did, "reject" Metaxas's argument that "the Bank was legally obligated to transfer the money to Ideal."  Metaxas has shown no error.

## DISPOSITION

The judgment is affirmed.  Gateway shall recover its costs on appeal.

_____
Richman, Acting P.J.

We concur:


_____
Stewart, J.


_____
Miller, J.


*Gateway Bank, F.S.B. v. Metaxas* (A158793)


37

| | |
|---|---|
| Trial Court: | San Mateo County Superior Court |
| Trial Judge: | Honorable Robert Baines |
| Attorney for Plaintiff and Respondent, Gateway Bank, F.S.B.: | Kirschenbaum Law, PC, Jeffrey B. Kirschenbaum, Raymond E. Loughrey, Kristin L. Williams |
| Attorney for Defendant and Appellant, Poppi Metaxas: | Katz Appellate Law, Paul J. Katz. |